Arthur Earvin STEPP,
Petitioner-Appellee,

v.

W. J. ESTELLE, Director, Texas
Department of Corrections,
Respondent-Appellant.

No. 74–2735.

United States Court of Appeals,
Fifth Circuit.

Dec. 8, 1975.

John L. Hill, Atty. Gen., Joe B. Dibrell, Larry F. York, John Pierce Griffin, Sarah Shirley, Asst. Attys. Gen., Austin, Tex., for respondent-appellant.

Michael J. Whitten, Denton, Tex. (Court-appointed), for petitioner-appellee.

Before WISDOM and BELL, Circuit Judges, and BREWSTER, District Judge.

BREWSTER, District Judge.

This habeas corpus action under 28 U.S.C.A. § 2254 seeks to set aside the conviction and life sentence of petitioner[1] on November 16, 1961, for robbery by assault in Cause No. 11,979, *State of Texas v. Arthur E. Stepp*, in the District Court of Denton County, Texas. The life sentence was pursuant to the provisions of Article 62, Vernon's Ann. Penal Code of Texas, an enhancement statute.[2]

Petitioner is also in state custody under three other felony convictions. On December 19, 1961, about a month after the trial in Denton County in the case here involved, he pleaded guilty in each of two robbery cases and in one felony theft case in Tarrant County, Texas, which adjoins Denton County. The sentences were twenty-five years in each of the robbery cases and five years in the theft case, all to run concurrently with each other and with the sentence for robbery in Denton County. The record here fails to show whether petitioner has yet made any collateral attack on the Tarrant County convictions.

The only question[3] here presented arose out of the fact that upon petitioner's insistence he was permitted to discharge his two court-appointed attorneys shortly before the completion of the *voir dire* examination of the jury panel in his robbery trial, and to proceed *pro se* thereafter. His petition asserted that his conviction should be set aside because: (1) the trial judge had notice of facts which required him to hold a hearing *sua sponte* to determine the question of petitioner's mental competency to waive his right to counsel; and (2) regardless of whether that Court should have held such a hearing, the fact is that he was mentally incompetent at the time to waive such right. After an evidentiary hearing, the Court below disagreed with petitioner's first contention, but accepted the second one and set aside the robbery conviction for the reasons set out in its memorandum opinion. That opinion says that the judge in the robbery trial could not be faulted for failure to hold a mental competency hearing on his own motion because the information he had was inadequate to require one.[4] The conclusory finding upon which the conviction was set aside was that a preponderance of the evidence showed "that

---

1. The parties will be referred to as "petitioner" and "respondent", according to their position in the trial court.

2. Article 62 provided:

   "If it be shown on the trial of a felony less than capital that the defendant has been before convicted of the same offense, or one of the same nature, the punishment on such second or other subsequent conviction shall be the highest which is affixed to the commission of such offenses in ordinary cases."

   The maximum possible punishment for the offense of robbery by assault, for which petitioner was convicted, was confinement for life in the penitentiary. In cases not involving the enhancement statutes, the punishment for such offense was confinement for life, or a term of not less than five years. Article 1408, V.A.P.C.

3. The petition alleged four grounds, but three of them were rejected by the trial court for the reason that they had been correctly determined by the state convicting court after full and fair evidentiary hearings in a series of habeas corpus proceedings. Those three grounds were that (1) the petitioner was denied his right of appeal from his robbery conviction through the neglect of the trial judge and his court-appointed counsel; (2) the trial court permitted petitioner to be handcuffed in the presence of the jury during the robbery trial; and (3) the petitioner was severely handicapped "in establishing his right to relief by habeas corpus" by the loss of the court reporter's shorthand notes of the trial. (The court reporter had died during the decade between the time of the robbery trial and the preparation of the petition setting out this allegation). These grounds are not urged on this appeal.

4. The opinion says: " . . . No such hearing took place, but the trial court cannot be faulted for his omission, since it acted correctly on the basis of the information available to it . . . "

the petitioner did not, at the time of his trial, have the mental capacity to competently and intelligently waive the right to counsel."

The respondent contends that the judgment should be reversed because the finding of lack of mental capacity to waive counsel was clearly erroneous. We agree.

The state court trial grew out of a robbery of a filling station operator in Sanger, a small town in Denton County, Texas. The robbery victim was the only possible witness who could be used by the prosecution to connect petitioner with the hijacking; so, when petitioner was ready to leave the station, he fired six shots from a small caliber pistol into the body of his victim and left him for dead. The operator had enough life left to crawl to a telephone after petitioner left and summon help, and he survived to testify in the robbery trial. The only issue petitioner took with the victim's testimony in the robbery trial was over how long the hijacking and shooting lasted. It apparently seemed longer to the victim than it did to the petitioner.

Two Denton lawyers were appointed several weeks in advance of the trial to represent petitioner in the robbery case. They were highly capable and made an exceptionally thorough investigation. There was never any friction or communication problem between them and petitioner. It was apparent all along that if

the robbery victim lived and became able to go to court and testify, the only possible defense would be insanity. A thorough research of that matter convinced defense counsel that there was no hope there.[5] They discussed the results of their investigation with petitioner and thought that he agreed with them. They negotiated a plea bargain whereby the prosecution agreed to recommend a sentence of forty-five years if the petitioner pleaded guilty. Petitioner rejected it because he said he could get out on parole on a life sentence as quickly as on one for forty-five years.

During his *voir dire* examination of one of the potential jurors, the prosecutor in the robbery case stated that the defense might be insanity. One of defense counsel objected on the ground that there was no intention to rely upon such a defense. Petitioner testified in this proceeding that that was the first time he knew that the defense of insanity had been abandoned, and that after his lawyer sat down, he quietly told him that he wanted to see the Judge.[6] The lawyer relayed the message to the Judge at the bench, and the Judge told the lawyer to find out what petitioner wanted to see him about. Petitioner's answer was that he wanted the Judge to appoint new counsel for him. It was almost noon, and court was recessed. The Judge had petitioner, his lawyers, the prosecutor and the Sheriff to come into his chambers to discuss the matter.[7]

---

5. Defense counsel spent considerable time interviewing the defendant in jail. They talked to his mother, to some people in Fort Worth, his home town, who were supposed to be inclined to help him, to a lawyer in Fort Worth who had represented him in a criminal case there, and to the psychiatrists at the Texas penitentiary who had observed and examined petitioner while he was serving some burglary sentences. The psychiatrists had petitioner *under rather extended observation while he* was in the hospital on two occasions, one at his own request and the other at the request of his mother. It was the unanimous opinion of the psychiatrists that there was nothing wrong with petitioner mentally. The other sources where inquiry was made also offered no support for the hope of petitioner and his mother that he could escape conviction on the robbery charge by defending on the ground of sanity.

As a last resort, defense counsel had petitioner examined by a psychologist at Denton to determine if he could offer any helpful suggestion. He was a Ph. D. on the staff of North Texas State University there, with experience in examining defendants in criminal cases. His examination resulted in nothing helpful to the petitioner.

6. The petitioner's action took place between the time a prospective juror was excused and another one was being brought into the courtroom for *voir dire* examination. The prospective jurors were being brought into the courtroom and examined on *voir dire* one at a time out of the presence of the balance of the panel.

7. The potential jurors were still circulating around, and this procedure was for the obvious purpose of trying to avoid their learning anything the petitioner might have had to say.

The following is quoted from the opinion of the court below:

"At the time he made this request, the petitioner did not exhibit any symptoms of mental illness or behave in any way that should have excited the trial judge's suspicions about his mental condition. The trial judge formed the impression that the petitioner was a shrewd individual, who was attempting to arouse the jury's sympathy, as well as their doubts about sanity, by demanding to conduct his own defense. . . .

"When confronted with the petitioner's extraordinary request, the trial judge conferred with the petitioner, in chambers, and attempted to dissuade him from attempting to conduct his own defense. The trial judge explained the hazards that face the layman who ventures to represent himself and praised the abilities of the petitioner's attorneys. The petitioner was not persuaded, and continued to insist on *pro se* representation. The trial judge spoke further with the petitioner, and formed the impression in his own mind that the petitioner was capable of making a knowing and intelligent decision to waive the right to representation by counsel. The trial judge then did a bit of legal research and concluded that, unless he believed the petitioner to be incompetent or incapable of making an intelligent choice, he could not deprive him of the right to proceed *pro se*. Accordingly, he acquiesced to the petitioner's demand, but ordered the two attorneys to remain at counsel table with the petitioner and make available their ad-

vice and assistance at any time he asked for them."

The judge of the convicting court acted correctly in denying petitioner's request after the trial started, with no showing of just cause, for appointment of new counsel. *Bowman v. United States,* 5 Cir., 409 F.2d 225 (1969); *United States v. Calabro,* 2 Cir., 467 F.2d 973 (1972).[8] The requirement that petitioner's appointed lawyers remain near him during the trial to give legal assistance if he requested it was also in accord with accepted practice. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, 581 (1975);[9] *Bayless v. United States,* 9 Cir., 381 F.2d 67, 71 (1967); *United States v. Price,* 9 Cir., 474 F.2d 1223 (1973).[10]

Neither the judge of the convicting court nor the judge of the federal court who held the habeas hearing had the advantage of a direct determination by the Supreme Court of whether the right of a defendant to represent himself in his criminal case has federal constitutional status, and if so, what the exact nature and extent of it is. The District of Columbia Court of Appeals, in *United States v. Dougherty,* 154 U.S.App.D.C. 76, 473 F.2d 1113, 1121–1123 (1972), pointed out that the Supreme Court had never held directly that such right in criminal cases in federal courts was derived from the Constitution, although there was dictum to that effect in *Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942). The Dougherty case did not pass on the constitutional question, but recognized that self-representation was a fun-

---

**8.** The opinion in the *Calabro* case says: ". . . A defendant with assigned counsel cannot decide for no good cause on the eve of or in the middle of trial that he will have another attorney represent him. . . ." 467 F.2d at 986.

**9.** The Supreme Court said in footnote 46 of the Faretta opinion, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581: ". . . Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the ac-

cused in the event termination of the accused's self-representation is necessary. See *United States v. Dougherty,* 473 F.2d 1113, 1124–1126."

**10.** The following is quoted from the Price case, at p. 1227: ". . . Although it is not error for the court to require counsel to be present and prepared to give advice, such counsel may not interfere with the defendant's presentation of the case and may give advice only upon request. . . ."

damental right which had existed under federal statute[11] since the day before the Sixth Amendment was proposed. In the thirty years between the decisions in *Adams* and *Dougherty,* most of the federal courts of appeals had gone along with the dictum in *Adams,* and had recognized that the right of *pro se* representation was a constitutional right derived under the Sixth Amendment. Some of those decisions were: *Juelich v. United States,* 5 Cir., 342 F.2d 29 (1965); *Middlebrooks v. United States,* 5 Cir., 457 F.2d 657 (1972); *United States v. Bentvena,* 2 Cir., 319 F.2d 916 (1963), cert. den. sub nom., *Ormento v. United States,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); *United States v. Plattner,* 2 Cir., 330 F.2d 271 (1964); *Bayless v. United States,* 9 Cir., 381 F.2d 67 (1967); *Arnold v. United States,* 9 Cir., 414 F.2d 1056 (1970), cert. den., 396 U.S. 1021, 90 S.Ct. 593, 24 L.Ed.2d 514; *Lowe v. United States,* 7 Cir., 418 F.2d 100 (1969), cert. den., 397 U.S. 1048, 90 S.Ct. 1378, 25 L.Ed.2d 660; *United States v. Pike,* 9 Cir., 439 F.2d 695 (1971). One of the few federal cases in which the rule was applied to criminal cases in state courts was *Maldonado v. Denno,* 2 Cir., 348 F.2d 12 (1969).

The Supreme Court has settled the question while this case has been pending in this court. *Faretta v. California,* supra. The following principles laid down by that case are applicable here:

1. The Sixth Amendment vests the right to conduct the defense of a criminal case directly in the accused. He has the choice of self-representation or of assistance of counsel.[12]

2. The right of self-representation is the basic or primary right, and that of assistance of counsel supplements it.[13]

3. "When an accused manages his own defense, he relinquishes, as a purely

11. As originally adopted, the statute read that, "in all courts of the United States the parties may plead and manage their own causes personally or by assistance of counsel . . . ." Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92. As subsequently amended, it is now 28 U.S.C.A. § 1654, which reads:

"In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to *manage and conduct causes therein.*"

12. "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his own defense. . . . Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." Footnote references in this quotation from the Faretta opinion, 422 U.S. 819, 95 S.Ct. at 2533, 45 L.Ed.2d at 572–573, are omitted.

". . . It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. . . ." 422 U.S. at 834, 95 S.Ct. at 2541, 45 L.Ed.2d at 581.

13. The following is from the paragraph in the Faretta opinion immediately following the language quoted in the first part of footnote 12: "The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. . . . To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. . . . Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." 422 U.S. at 820–821, 95 S.Ct. at 2534, 45 L.Ed.2d at 573–574.

One of the foundations for holding that the right of self-representation was implied in the Sixth Amendment was the past recognition of that right in the opinions of the federal courts of appeals. The following is quoted from the Court's favorable comment on one of those opinions (*United States v. Plattner,* 2 Cir., 330 F.2d 271): ". . . The right to the assistance of counsel, the court concluded, was intended to supplement the other rights of the defendant, and not to impair 'the absolute and primary right to conduct one's own defense in propria persona.' . . ."

On pp. 827–828 of 422 U.S., on p. 2537 of 95 S.Ct., on p. 577 of 45 L.Ed.2d, the Supreme Court speaks of the "basic right of self-representation."

factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forego those relinquished benefits. . . . Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with his eyes open'. . . ." 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–582.

4. In the next paragraph after the one quoted just above, the Court further said:

". . . We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." 422 U.S. at 836, 95 S.Ct. at 2541, 45 L.Ed.2d at 582.

5. ". . . Moreover it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. . . ." 422 U.S. at 834, 95 S.Ct. at 2540, 45 L.Ed.2d at 581. 581.

The status of the law on the constitutional question before Faretta could not have had much effect on the judge of the convicting court in the robbery trial because the Bill of Rights of the Texas Constitution provided that an accused "shall have the right of being heard by himself or counsel, or both." Article 1, Section 10, Constitution of Texas. The record indicates, however, that the situation was different at the federal habeas corpus hearing. It is clear that the judge who presided there and the lawyers who participated in it did not realize the full scope and nature of the right of an accused to defend himself. The

memorandum opinions obviously proceeded on the theory that the right to assistance of counsel was the primary right and that the right of self-representation was the supplementary one, and that petitioner's lack of technical legal knowledge was an important factor to be considered in assessing his knowing exercise of his right to proceed in *propria persona.*

The trial court wrote two memorandum opinions in this case, one on October 29, 1973, and the other on June 3, 1974. The following quotations from those opinions summarize the factors the court took into consideration in reaching the conclusion that the petitioner was mentally incompetent to waive counsel.

"This court has heard the evidence of the petitioner, Stepp, and of the state. It finds, from a preponderance of the evidence, that the petitioner did not, at the time of his trial, have the mental capacity to competently and intelligently waive the right to counsel. The Court has come to this conclusion after consideration of the petitioner's psychiatric history and suicide attempt shortly before trial, the relative importance of the right of counsel, and the intrinsic difficulties to a layman attempting his own defense. In so finding, the court imputes no error to the judge at the petitioner's trial, who was, as has been noted, entirely unaware of the petitioner's history." (Opinion of June 3, 1974).

"The material in the petitioner's history suggesting his mental instability consisted of some chemotherapeutic treatments at various correctional institutions, a suicide attempt, and his insistence that he wishes to handle his own defense. . . ." (Opinion of October 29, 1973).

■ Since statutory post-conviction actions are civil proceedings, the fact findings of the trial court are conclusive unless they are clearly erroneous. *Rushing v. Wilkinson,* 5 Cir., 272 F.2d 633, 683, n. 3 (1959); *United States ex rel. Goins v. Walker,* 5 Cir., 340 F.2d 6, 9

(1964); *Rosecrans v. United States,* 5 Cir., 378 F.2d 561, 566 (1967); *Diggs v. United States,* 5 Cir., 447 F.2d 460, 462 (1971). The test for determining whether a finding is clearly erroneous was stated in the recent case of *Causey v. Ford Motor Co.,* 5 Cir., 516 F.2d 416 (1975), to be:

". . . Rule 52(a), F.R.Civ.P., lays down the 'clearly erroneous' test for appellate review of district court findings of fact. Under this test, a finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed' by the district court. *United States v. United States Gypsum Co.,* 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766. See also *Chaney v. City of Galveston,* 5 Cir., 1966, 368 F.2d 774, 776."

◼ The trial court's judgment was predicated upon its finding that the petitioner did not "have the mental capacity to competently and intelligently waive the right to counsel." That was an ultimate fact, rather than one of a subsidiary or an evidentiary nature; and the following language from the *Causey* case, supra, is therefore applicable:

"There exists, however, a significant distinction for the purpose of applying the clearly erroneous test between findings of subsidiary fact and findings of ultimate fact. See *Galena Oaks Corp. v. Scofield,* 5 Cir., 1954, 218 F.2d 217, 219–20. . . . With respect to ultimate findings of fact, furthermore, we noted in *Industrial Instrument Corp. v. Foxboro Co.,,* supra [5 Cir.], 307 F.2d [783] at 786 n. 2:

" 'We may reverse freely of the clearly erroneous rule where . . . the issue revolves around an ultimate fact question as distinguished from subsidiary fact questions . . . .' "

◼ The first subsidiary factor relied upon by the court below was the petitioner's psychiatric history. Most of the evidence of that history is in the form of hospital and medical records. The only oral testimony regarding petitioner's history was given by him on the federal court hearing on the present Sec. 2255 motion. He testified that he had been nervous all his life; that during the times he was serving terms in state penitentiaries on previous convictions,[14] he had two "blackout spells", one in 1954 and the other in 1960, while he was doing farm work in the fields; that he was in the institution hospital on two occasions for substantial periods while he was in the Texas penitentiary; that three or four kinds of medicine were prescribed for him while he was in the hospital, but he did not know what they were for; that on one occasion while in jail two or three days prior to the trial of the robbery case in Denton, he "slashed" his wrist four or five places for the purpose of committing suicide.

The hospital and medical records are in an exhibit admitted in evidence which was certified to contain all medical, psychiatric and psychological records reflecting any evaluation of petitioner's mental and emotional stability while in custody of the Texas Department of Corrections in the 1950's on the five burglary sentences and in the 1960's on the three robbery and felony theft convictions.

Each of the mental examinations of petitioner was provoked either by him or by his mother. He was trying to get released from the farm work to which he had been assigned, and she was trying to excuse his conduct. The records show that petitioner was examined by each of the following psychiatrists while in pris-

14. The records of the Texas Department of Corrections admitted in evidence in this case show that the petitioner spent most of the time from 1954 to 1960 in the Texas penitentiary on sentences on five burglary convictions. Prior to 1954, he had served a sentence in the Colorado penitentiary on a conviction for grand larceny. He had been out of the Texas penitentiary only a short time when he committed the robberies for which he was convicted in Denton and Tarrant Counties.

on: Dr. C. A. Shaw, in 1955; Dr. Alvin Beyer, Jr., in 1956; Dr. William B. Estes, in 1959; and Dr. Lee Hartman, in 1960. The records also contain reports on petitioner by Dr. M. D. Hansen, Medical Director, in 1966; by Dr. Robert W. Johnson, Staff Physician, in 1957; and by Dr. Jerry W. Gunter, Counseling Psychologist, in 1965. On at least two occasions, petitioner was kept in the hospital under observation for several days. Those experts were unanimous in their opinions that petitioner was not psychotic or mentally ill to any extent. The observations which follow are taken from their reports. The chief complaint of petitioner and his mother was his nervousness evidenced by the slight tremor in his hands.[15] The nervousness was due to emotional problems, not to any mental defect or disorder. Petitioner's thinking was well organized. He was well oriented in all spheres, and in good contact with, and aware of, his situation and surroundings. Dr. Gunter, the Counseling Psychologist, reported that petitioner was a chronic malcontent and a "role player . . . calloused and dysocial"; that he was resentful of authority, and was "capable of mutilation to manipulate his environment". Dr. Johnson reported that petitioner told him that the only way he could get released from farm work was through sickness or injury and that he had his arm broken intentionally to get out of farm work. The medication given him for his nervousness was thorazine.

It is not clear whether the trial court misinterpreted the contents of the records, or concluded that the mere fact that petitioner was the subject of a number of examinations by psychiatrists was enough to establish his incompetency, regardless of how the examinations came about and of what the results were. In either event, the "petitioner's psychiatric history" in this case is wholly inadequate to support the finding of mental incapac-

ity. It overwhelmingly refutes such a finding.

■ The third factor considered by the trial court was the fact that petitioner attempted to commit suicide two or three days before the robbery trial. Petitioner testified that he got behind some blankets which he had fastened to the bars of his cell and cut his wrist in four or five places with a razor blade; that an inmate of the cell block saw the blood and got a trusty to summon help; that the jailer took him to a doctor; that no stitches were taken and he received no blood transfusion. The cuts were not serious. They appeared to be mere scratches when the robbery case came to trial. Nobody involved took the incident seriously at the time of the trial. It became serious for the first time in this one of a series of post-conviction cases more than a decade later. It is stretching the evidence to call this "wrist slashing" a suicide attempt. An adult person knows that there is no danger of death from a cut on the wrist unless the large vein or artery is slashed. Petitioner did not cut there. He could have killed himself if he had wanted to do it. His lawyer testified that petitioner did not want to go to trial at the time. Some defendants, facing an almost certain conviction and a long sentence, resort to cutting their arms or wrists. See *United States v. Bentvena*, supra, at p. 936 of 319 F.2d. In their minds, it can help them get a continuance or bolster their plea of insanity. As is pointed out in the summary of the petitioner's hospital and medical records, he was regarded by staff members at the hospital as a callous role player who would mutilate himself to manipulate his environment. However, even if the petitioner made an actual attempt to kill himself on the occasion in question, that alone would not support a finding of lack of mental capacity, for the mere fact of suicide, standing alone, does not prove mental illness or incapaci-

---

**15.** That the tremor was very mild was evidenced by the fact that it did not affect petitioner's marksmanship while he was firing six bullets from a pistol into the body of his victim in the hijacking.

ty. *Jones v. Traders & General Ins. Co.,* Tex.Comm.App., 140 Tex. 599, 169 S.W.2d 160 (1943), opinion adopted by Supreme Court; *Morris v. United States,* N.D.Tex., 217 F.Supp. 220, 228 (1963). That psychiatrists have the same viewpoint is evidenced by the fact that petitioner was admitted to the hospital at the penitentiary on one occasion because he had written the warden that he was going to kill himself. After having him under observation several days, Dr. Hartman, his examining psychiatrist, reported that there was "no evidence of psychosis or mental disorder."

▮ The last factors given by the trial court as support for his finding of lack of mental capacity were, "his insistence that he wished to handle his own defense at the trial in question", and "the relative importance of the right to counsel, and the intrinsic difficulties of a layman attempting his own defense." The statement about the "relative importance of the right to counsel" shows that the trial judge considered that right to be primary, and the right to self-representation to be supplementary. The Faretta case repudiates that view. The petitioner's "insistence that he wished to handle his own defense" in the robbery trial was an exercise of his constitutional right to self-representation, and, as such, could not be proof of lack of mental capacity. The reliance on the "intrinsic difficulties of a layman attempting his own defense" means that the trial judge went in the teeth of the holding in *Faretta* that the technical legal knowledge of the accused is "not relevant to an assessment of his knowing exercise of the right to defend himself." 422 U.S. 836, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. The Faretta case points out that there could be cases where the accused might benefit by conducting his own defense. See also *United States v. Dougherty,* supra, and *Middlebrooks v. United States,* 5 Cir., 457 F.2d 657 (1972). Where the defendant is without counsel,

he has a chance to get the sympathy of the jury, and the prosecutor has to tread softly to avoid giving the impression that he is taking undue advantage. If proceeding without counsel fails to help the accused before the jury, he finds that the appellate and the post-conviction courts are more lenient with him. These things usually apply to a case which appears hopeless to the defendant, where there is very little a lawyer can do for him. This was such a case. There was no chance to win it on the facts, and there was nothing complicated about the law.

Petitioner's strategy was bound to give him a point for a post-conviction action, whichever way the trial judge ruled. If he had refused petitioner's request to be allowed to conduct his own defense, petitioner would have claimed he was denied his right of self-representation. When he granted the request, he put petitioner in position to claim he lacked the capacity to make a knowing and intelligent choice between assistance of counsel and self-representation.

▮ The burden was on the petitioner to prove by a preponderance of the evidence that he did not competently and intelligently waive his right to assistance of counsel. *Johnson v. Zerbst,* 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). He failed to discharge that burden. The record shows beyond question that he was made aware of the dangers and disadvantages of self-representation; that he knew what he was doing; and that his choice was made with his eyes open. That satisfied the test laid down in the Faretta case. 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. The finding of the trial court that petitioner lacked the capacity to make a knowing and intelligent choice is therefore clearly erroneous.

The judgment is reversed and remanded with directions to enter an order denying the petition for habeas corpus.