**Ralph PARTRIDGE and Betty Partridge, Plaintiffs-Appellants,**

**v.**

**TWO UNKNOWN POLICE OFFICERS OF the CITY OF HOUSTON, TEXAS, et al., Defendants-Appellees.**

No. 83–2615.

United States Court of Appeals, Fifth Circuit.

Feb. 4, 1985.

E. Grady Jolly, Circuit Judge, filed dissenting opinion.

---

John P. Mustachio, Houston, Tex., for plaintiffs-appellants.

Mary Madigan Dinan, Asst. City Atty., Houston, Tex., for City of Houston and Houston Police.

D. Reid Walker, Houston, Tex., for Morris.

Before WISDOM, RANDALL and JOLLY, Circuit Judges.

WISDOM, Circuit Judge:

The question this case presents is whether the Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty upon the state to protect prisoners (here detainees) from themselves. The parents of Michael Wayne Partridge brought suit under 42 U.S.C. § 1983 (1982) against the City of Houston, its police de-partment, and various persons within the department after their son hanged himself in a solitary cell within a few hours of his arrest. The district court dismissed the suit under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. The Partridges appealed, claiming that their son's medical alert braclets, his aberrant behavior upon arrest, his record of an earlier attempted hanging, and his father's warning to the arresting and transporting officers that Michael was unstable should have alerted the jail's staff to their son's suicidal condition. The Partridges also alleged that inadequate training and staffing within the jail facility contributed to the jail staff's inattention to their son's suicidal behavior. Although the dismissal of the suit against James Morris, the transporting officer, was proper, we find that it was error to dismiss the claim and accordingly reverse.

## I. FACTS AND PROCEEDINGS BELOW

The pleadings state the following facts. In February 1980, a Houston police officer arrested Michael Wayne Partridge on suspicion of burglary and theft.[1] While the officer was investigating the scene of the alleged crime, Partridge became agitated and violent, and attempted to kick the doors and windows out of the car. The officer, who was working alone at the time, requested a two-man unit to transport Partridge to the jail. When the back-up unit arrived, Partridge was still kicking at the doors and windows. A sergeant at the scene asked Partridge's father if the boy had any "mental problems". Partridge's father told the officer that the boy had suffered a nervous breakdown.

The two transporting officers, one of whom was Morris, handcuffed Partridge and drove him to the jail. On the way to the jail, Partridge intentionally struck his head at least once against the plexiglass divider between the front and back seats. Morris was able to calm Partridge, and by

---

1. There is no contention that the arrest was improper.

the time they arrived at the jail, Partridge seemed composed. Neither of the two officers called anyone's attention to Partridge's aberrant behavior. Partridge was placed in solitary confinement. The jailor was unaware that Partridge's clinical record showed that Partridge had attempted suicide during an earlier confinement. The records were maintained four doors away from the booking desk. The jailor did see Partridge's two medical alert bracelets, and noted on Partridge's booking card "heart and mental". Three hours later Michael Partridge hanged himself.

The plaintiffs further alleged that suicide is a known risk at detention centers, that defendants knew or should have known of Partridge's suicidal tendencies, and that the defendants' policies and procedures inadequately protected detainees from the risk of suicide.[2] The defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted, arguing that the complaint failed to allege unconstitutionally cruel and unusual conditions at the jail, and that the complaint failed to allege a legal deprivation or a pattern, practice, or policy that could have caused any deprivation.

Upon the defendants' motion to dismiss and the plaintiff's response, the district court held that the plaintiffs had failed to state a claim under the "deliberate indifference" standard of *Estelle v. Gamble*, 1976, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, 260. The court explained:

> "In light of considerations established by the Court of Appeals for the Fifth Circuit in *Woodall v. Foti*, 648 F.2d 268 (5th Cir.1981), to determine whether the alleged denial amounts to deliberate indifference to the decedent's medical needs, it is the opinion of the Court that the plaintiffs' claim is insufficient to state a

claim for relief under 42 U.S.C. 1983 (1976)."

This appeal followed.

## II. DISCUSSION

### A. The Standard of Review

■ The district court styled its action as a dismissal under Fed.R.Civ.P. 12(b)(6), although it stated in its dismissal that it had "reviewed the record". We therefore face at the outset the question of whether we should treat the court's action as in fact a grant of summary judgment.[3] *Carpenters Local v. Pratt-Farnsworth*, 5 Cir.1982, 690 F.2d 489, 500 (Randall, J.), *cert. denied*, 1983, —— U.S. ——, 104 S.Ct. 335, 78 L.Ed.2d 305. (See also *Carter v. Stanton*, 1972, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569, 572, in which, when the court considered matters outside the pleadings, a motion to dismiss was treated as a motion for summary judgment.) To the extent that the district court treated the motion to dismiss as a motion for summary judgment, we find that the ruling was premature. Such a motion is proper only if there are no matters open to factual dispute. In the present case, there are both material facts that are disputed and material facts that are unknown. The extent of Partridge's aberrant behavior during arrest and transport to the jail is uncertain. The record does not adequately reveal the jail's cell watch procedures and whether these procedures were followed. There is little discussion of policies at the jail or training of its staff. It is unclear if the jail took any precautions against suicide, such as removing an inmate's belt and shoelaces. Although we express no opinion on these issues or their relative weight, the failure to address them, together with the incomplete nature of the record before us and before the district court, makes summary judgment inappropriate.

---

2. The plaintiffs also claimed damages under the Texas Survival Statute and the Texas Wrongful Death Act.

3. When the trial court considers matters outside the pleadings, the motion to dismiss must be treated as a motion for summary judgement, and the proceedings must comport with the hearing and notice requirements of Fed.R.Civ.P. 56(c). *Underwood v. Hunter*, 5 Cir.1979, 604 F.2d 367, 368, 369 (collecting cases).

■ To the extent that the district court confined itself to the pleadings, we treat the ruling as a response to a motion to dismiss under Fed.R.Civ.P. 12(b)(6). In reviewing such a dismissal, we may not go outside the pleadings. We accept all well pleaded facts as true and view them in the light most favorable to the plaintiff. *Carpenters Local*, 690 F.2d at 500. We cannot uphold the dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". *Conley v. Gibson*, 1957, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80, 84; *Cook & Nichol, Inc. v. Plimsoll Club*, 5 Cir.1971, 451 F.2d 505, 506. Suicidal behavior evidences a serious medical need, and deliberate indifference to such behavior violates the Eighth Amendment's prohibition against cruel and unusual punishment. We find that the plaintiffs have alleged a cognizable claim under section 1983.

*B. The Scope of Duty Under Section 1983*

The Supreme Court has held that prison authorities have a duty under the Eighth Amendment to provide needed medical care for inmates, and that "deliberate indifference to serious medical needs of prisoners" violates the Constitution. *Estelle v. Gamble*, 1976, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, 260. Our Court has recently summarized the law on this point:

"The state has an 'obligation to provide medical care for those whom it is punishing by incarceration.' '[A]cts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs' of inmates constitute cruel and unusual punishment."

*Ruiz v. Estelle*, 5 Cir.1982, 679 F.2d 1115, 1149.

■ The defendants acknowledge that prison authorities have a constitutional duty to provide necessary medical care to inmates under *Estelle*, but contend that the duty does not extend to protecting inmates from themselves.[4] We find, however, that the Eighth Amendment does reach some instances of deliberate self injury. This holding is consistent with the position taken by other courts of appeals and comports with our own precedents.

■ There is no sound underlying distinction between the right to medical care for physical ills and for psychological or psychiatric afflictions. *See Woodall v. Foti*, 5 Cir.1981, 648 F.2d 268, 272; *Bowring v. Godwin*, 4 Cir.1977, 551 F.2d 44, 47. Treatment of mentally disturbed inmates is a "serious medical need" under *Estelle*. *Woodall*, 648 F.2d at 272. The "deliberate indifference" standard of *Estelle* is therefore equally applicable to assessing the constitutional adequacy of treating psychological or psychiatric ailments at a prison.

■ Suicidal tendencies evidence a psychological or psychiatric condition that could be as serious as or more serious than any physical pathology or injury. And just as a failure to act to save a prisoner suffering from gangrene might constitute deliberate indifference, *Bass v. Sullivan*, 5 Cir. 1977, 550 F.2d 229, 231–32, *cert. denied*, 434 U.S. 864, 98 S.Ct. 195, 54 L.Ed.2d 138, failure to take any steps to save a suicidal prisoner from injuring himself may also constitute deliberate indifference to a serious medical need. Such indifference might be manifested by failure to search adequately a medically trained prisoner who had repeatedly threatened to smuggle poi-

4. Pretrial detainees are often entitled to greater protection than convicted persons. *See Bell v. Wolfish*, 1979, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447; *Jones v. Diamond*, 5 Cir.1981, 636 F.2d 1364, 1368 ("The due process clause accords pretrial detainees rights not enjoyed by convicted inmates."). Although "[t]he standard by which to measure the medical attention that must be afforded pretrial detainees has never been spelled out," *Jones v. Diamond*, 636 F.2d at 1378, both this Circuit and other circuits have held that pretrial detainees are entitled to at least the level of medical care set forth in *Estelle*. *See id.; Guglielmoni v. Alexander*, D.Conn.1984, 583 F.Supp. 821; *Matje v. Leis*, S.D.Ohio 1983, 571 F.Supp. 918. We have been unable to find any case imposing a greater duty to provide medical care for pretrial detainees than for convicted persons, and decline to impose such an additional duty here.

son into jail or by failure to monitor adequately a prisoner who had twice before unsuccessfully attempted suicide.[5]

■ Defendants contend that the state cannot be liable in a section 1983 action when the plaintiff died by his own hand rather than by the hand of another. We hold, however, that this distinction is not a bar to a section 1983 cause of action. In *Scharfenberger v. Wingo*, 6 Cir.1976, 542 F.2d 328, the plaintiff prisoner brought a section 1983 action alleging that he suffered two amputation operations to his right arm because he was injured by an injection with a drug provided by the prison's infirmary. The evidence was unclear whether the prisoner had injected himself or whether the injection had been made by one of the infirmary staff. The court held:

"Defendants expend considerable effort seeking to prove that Scharfenberger injured himself. We regard this issue as irrelevant because a prisoner's custodians cannot lawfully deny him adequate medical care even in instances of deliberate self injury."

*Id.* at 330.

Although *Scharfenberger* concerned the adequacy of treatment after the prisoner's arm began swelling rather than the propriety of injecting the substance into the inmate, subsequent courts have followed *Scharfenberger* to hold that liability under section 1983 "may be predicated upon inadequate custodial care of an inmate who might harm herself". *Matje v. Leis*, S.D. Ohio 1983, 571 F.Supp. 918, 930. Protecting inmates from themselves is "an aspect of the broader constitutional duty to provide medical care for inmates". *Guglielmoni v. Alexander*, D.Conn.1984, 583 F.Supp. 821, 827.

Our own Court has not specifically addressed the question whether the Eighth Amendment in some instances protects prisoners who may harm themselves. In the closest case on point, *Wright v. Wagner*, 5 Cir.1981, 641 F.2d 239, the plaintiffs argued, after an inmate's suicide, that an alleged failure to comply with Tex.Rev.Civ. Stat.Ann. art. 5115 (Vernon Supp.1984)[6] established as a matter of law a violation of the Eighth Amendment cognizable under section 1983. In affirming the district court's finding that there was no violation of article 5115, the Court intimated that an inmate's suicide could create section 1983 liability: "We think that a failure to place Mitchell in a padded cell or to otherwise deal with his violent behavior would not violate eighth amendment standards *absent deliberate indifference* to his condition and the likely consequences of that condition." *Wright v. Wagner*, 641 F.2d at 241–42 (emphasis added). Moreover, this Court has recently held that one of the criteria for determining whether denial of psychiatric treatment for a prisoner violates the Eighth Amendment is "the extent to which the [mentally disturbed] prisoner presents *a risk of danger to himself* or other inmates". *Woodall v. Foti*, 5 Cir.1981, 648 F.2d 268, 272 (emphasis added). We now hold explicitly that deliberate indifference to a prisoner's suicidal behavior constitutes a violation of the Eighth Amendment under *Estelle.*

**C. Assessing a Section 1983 Claim for Failure to Protect Against Self-Injury**

■ A prisoner's or detainee's right under the Eighth Amendment to be protected from himself is not unlimited. The "deliberate indifference" standard is met only if there is a strong likelihood, rather than a mere possibility, that injury will occur.

■ First, a plaintiff must prove that deliberate indifference exists. Other

---

**5.** These examples are from cases in other circuits that have held that a prison is potentially liable for an inmate's suicide: *Guglielmoni v. Alexander*, D.Conn.1984, 583 F.Supp. 821, 826–27 (denying defendants' motion for summary judgment in suit alleging inadequate cell checking after victim had twice before attempted to kill himself); *Matje v. Leis*, S.D.Ohio 1983, 571

F.Supp. 918, 930–31 (denying defendants' motion for summary judgment after nurse committed suicide in county jail).

**6.** Article 5115 outlines procedures for confinement of detainees suspected of insanity or who have been legally adjudged insane.

courts have held, and we agree for present purposes, that deliberate indifference exists when action is not taken in the face of "a strong likelihood, rather than a mere possibility" that failure to provide care would result in harm to the prisoner. *See State Bank v. Camic,* 7 Cir.1983, 712 F.2d 1140, 1146, *cert. denied,* 1983, —— U.S. ——, 104 S.Ct. 491, 78 L.Ed.2d 686; *Guglielmoni v. Alexander,* D.Conn.1984, 583 F.Supp. 821, 826; *Matje v. Leis,* S.D.Ohio 1983, 571 F.Supp. 918, 930. As noted in *Vun Cannon v. Breed,* N.D.Cal.1975, 391 F.Supp. 1371, 1374–75, "a guard does not have to believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur."

A plaintiff might also show deliberate indifference by revealing a pattern of medical neglect. Although a delay or denial of medical care may be mere negligence, and thus not actionable under section 1983, repeated examples of such treatment would indicate a deliberate indifference by prison authorities. As the Second Circuit has held, "a series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners". *Todaro v. Ward,* 2 Cir.1977, 565 F.2d 48, 52.

 The evaluation of medical care for inmates, however, is an area of special deference from the courts, for it is related to both prison administration and medical judgment, two areas where the courts have acknowledged their limited expertise. *Procunier v. Martinez,* 1974, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224; *cf. Woodbury v. McKinnon,* 5 Cir.1971, 447 F.2d 839. Mere negligence, neglect, or medical malpractice is insufficient to state a claim for an *Estelle* violation. *Fielder v. Bosshard,* 5 Cir.1979, 590 F.2d 105. As this Court has recently held: "The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that

Medicare and Medicaid provide for the aged or the needy. It prohibits only 'deliberate indifference to serious medical needs'." *Ruiz v. Estelle,* 5 Cir.1982, 679 F.2d 1115, 1149, *cert. denied,* 1983, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795.

### D. Review of the Pleadings

 Having established the standard to which the defendants must be held under *Estelle,* we return to the pleadings. The claim against Officer Morris, who transported Partridge to the jail, was properly dismissed under Rule 12(b)(6). The pleadings show, at worst, negligence. Morris's only offense was his failure to alert jail personnel to Partridge's aberrant behavior. This failure, without more, does not rise to the level of "deliberate indifference".

The pleadings against the remaining defendants present a different situation. The plaintiff alleged that the Houston Police had notice of Partridge's suicidal tendencies because of his aberrant behavior during his arrest and transport to the station, because of the warning in his wallet that he was under psychiatric care, because his father had informed the arresting officer that his son had suffered a nervous breakdown, and because the jail's records indicated that Partridge had attempted suicide during a detention just a few months before.

One means of establishing an *Estelle* claim is to prove state inaction in the face of a strong likelihood that harm will occur. Taken together, the allegations in the pleadings state a "strong likelihood" of harm sufficient to survive a motion to dismiss under 12(b)(6). It is also possible that the plaintiffs might be able to prove that the jailor's failure to consult the clinical records constituted "deliberate indifference".

Whether the defendants' failure to consult their medical records or to exercise special care in detaining Partridge given his aberrant behavior and the warnings constitute deliberate indifference are questions upon which we express no opinion. If

the case reaches trial, these will be questions for the jury. We hold here merely that the pleadings allege a cause upon which relief might be granted. The district court's dismissal under Fed.R.Civ.P. 12(b)(6) is therefore REVERSED.

E. GRADY JOLLY, Circuit Judge, dissenting:

### I.

I have serious doubts about the method of analysis of the majority opinion, serious concern about its practicality and impact for prison officials, and disbelief at its conclusion from the facts pled. I do agree, however, that the procedural posture of this case is correctly characterized by the majority as an appeal from the grant of a motion to dismiss for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6). In reviewing the dismissal we must look to the pleadings and accept their allegations of fact as true for the purposes of this appeal. Accordingly, I look only to see whether, under the complaint, there is any set of facts that entitles the plaintiffs to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Because I believe the complaint here fails to state a claim upon which relief may be granted, I respectfully dissent.

There may be some very few cases in which the eighth amendment affords a prisoner protection from his own hand under *Estelle v. Gamble;* however, even assuming that *Estelle v. Gamble* governs the present case, the majority's application of *Estelle v. Gamble* is untenable. The majority states that *State Bank v. Camic* correctly interpreted *Estelle v. Gamble's* "deliberate indifference" standard as applied to cases involving prisoner suicides. *State Bank* held that the "deliberate indifference" standard is met only where there is a "strong likelihood, not a mere possibility" that the prisoner would kill himself. *State Bank* at 1146. That does not mean a *simple* likelihood; what is required is a *strong* likelihood: suicide must be *much* more likely than not to occur. Thus, to state a claim, the complaint must, at a

minimum, allow the plaintiffs to prove facts which would demonstrate that the City of Houston is chargeable with knowledge that Michael Partridge was *much* more likely to kill himself than not to kill himself. For the reasons detailed below, the complaint in this case is inadequate under *State Bank* and *Estelle v. Gamble;* I would dismiss it.

The facts set forth in the complaint which indicate the nature of Michael's condition are insufficient to state a claim for "deliberate indifference." "The complaint must allege enough facts of prior psychiatric illness or treatment, of expert medical opinion, or behavior *clearly evincing"* the psychiatric need in question—here, constant monitoring and protection. *Woodall v. Foti*, 648 F.2d 268 (5th Cir.1981) (emphasis added). The information which the complaint alleges should have been available to jail personnel is first, that Michael's father told the arresting officers that Michael had previously had a "nervous breakdown" and that his son had a "medical alert" bracelet to that effect; second, that the jail clinic records indicated Michael had previously attempted suicide in prison; and, third, that Michael kicked the squad car doors and windows, and banged his head on its plastic divider, but calmed down when the officers spoke to him.

None of the facts alleged clearly evinces that it was strongly likely that Michael was about to kill himself. Michael's "medical alert" bracelets carried only the inscriptions "Medical Alert—See Card" and "Heart Patient." The jail personnel noted that Michael wore these bracelets, the complaint says. The "card" was actually a letter, which is attached to the complaint, stating that Michael was under the care of a psychologist for a "mild" organic brain syndrome for which he took Valium. That Michael took Valium in no way indicates a potential for suicide; Valium is one of the most widely prescribed drugs in the country; millions of people take it every day for mild anxiety and other psychological problems. Neither can the fact that Michael had previous psychological problems nor

his behavior in the squad car after his arrest be considered as clearly evincing a strong likelihood *that he would kill himself.* According to the most recent research, "approximately 15 to 20 percent of prison inmates manifest sufficient psychiatric pathology to warrant medical attention . . . ." Monahan and Steadman, *Crime and Mental Disorder,* 4 Crime and Justice 145, 166 Morris and Tonry Eds. (1983) (cited below as *Monahan* ) quoting Roth, *Correctional Psychiatry in Modern Legal Medicine, Psychiatry and Forensic Science,* ed. W. Curran, A. McGarry, and C. Petty, Philadelphia: Davis. In addition, a recent study of police officers revealed that in a random group of persons arrested for criminal behavior (excluding drunkenness) the arresting officers considered eighteen percent of the detainees to be "somewhat" mentally ill. *Monahan* at 153. These studies indicate that a very large fraction of the detainee population have symptoms and histories of mental illness as severe as those of Michael Partridge; it is unsupportable to claim that facts true of perhaps one-fifth of all detainees could have clearly evinced a strong likelihood that this detainee would commit suicide. In addition, Michael's kicking the squad car doors and windows and banging his head on the plastic divider is not so different from an ordinary resistance to arrest that it could be considered as clearly evincing that Michael was much more likely than not to kill himself in jail.

Even a prison clinic record of an inmate's attempted suicide does not clearly evince that a prisoner is a very likely suicide, as this court has noted in the past:

> Petitioner . . . cut his wrist in four or five places with a razor blade . . . . It is stretching the evidence to call this "wrist slashing" a suicide attempt . . . . Some defendants, facing an almost certain conviction and a long sentence, resort to cutting their arms and wrist. *See United States v. Bentvena* . . . . In their minds, it can help them get a continuance or bolster their plea of insanity . . . . [Petitioner] was . . . a callous role player who would mutilate himself to manipu-

late his environment. However, even if petitioner made an actual attempt to kill himself on the occasion in question, that alone would not support a finding of lack of mental capacity, for the mere fact of suicide, standing alone, does not prove mental illness or incapacity.

*Stepp v. Estelle,* 524 F.2d 447, 454 (5th Cir.1975) (Wisdom, J. joining the court's opinion).

In *United States v. Bentvena,* 319 F.2d 916 (2d Cir.1963), one of the defendants, while in pre-trial detention, hanged himself in his cell, but was unharmed. The next day he slashed his wrists in the shower. The court observed that the defendant's acts were designed to delay the trial and to manipulate the court and prison officials and accordingly held that the defendant had waived his sixth amendment rights when the trial court refused to delay the trial, forcing the defendant to appear without counsel. *Bentvena* at 930, 936. *Bentvena* illustrates that there is simply no way the jail personnel could have known of the seriousness of Michael's condition even if they had had access to the clinic report.

## II.

The degree to which the majority opinion departs from accepted principles is indicated by its strained use of precedent. Although the majority cites *Wright v. Wagner,* that case stands firmly against the contention that the present complaint states a claim. In *Wright* the prisoner had attempted to commit suicide by hanging himself soon after his arrest, but failed. Later the same day he deliberately banged his head against the wall of his cell and told a prison matron that he had done so intentionally and had no regard for his physical well-being. Two days later he was found dead from a brain hemorrhage in his cell. Although the prison had failed to take the effective suicide prevention measures urged by the plaintiffs, the district court found the prison not liable under *Estelle v. Gamble* or even under the associated state wrongful death claim. This court affirmed, finding that the prison's

failure to "deal with ... [the prisoner's] ... violent behavior would not violate eighth amendment standards absent deliberate indifference to his condition and the likely consequences of that condition." *Wright* at 242. In *Wright,* no such deliberate indifference was shown.

Similarly, *Estelle v. Gamble* itself rebuffs the majority's positions. Gamble complained repeatedly to prison authorities of severe pains in his chest, arms and legs and of "blank outs" for days after he unloaded a truck. He was not only denied treatment but was subjected to discipline for "shirking" his work. In *Estelle v. Gamble* the prison could have treated Gamble at almost negligible cost and relieved the severe pain which he continually brought to their attention in the face of disciplinary action. Even on these facts and despite the fact that Gamble filed his complaint *pro se,* he was held not to have stated a claim upon which relief could be granted, *Gamble v. Estelle,* 554 F.2d 653 (5th Cir.1977) (on remand), and yet, no allegations even comparable to the rejected allegations of *Estelle v. Gamble* have been made in the present case.

The majority's other use of precedent is equally questionable. That *Woodall v. Foti* supports dismissal of this claim has been touched on above. The majority's effort to find support in *Scharfenberger v. Wingo* is also strained. *Scharfenberger* held that a prison is required to supply medical care to prisoners requesting it even for self-inflicted wounds. *Schafenberger* says nothing about a prison's obligation to prevent a prisoner from harming himself; accordingly, that case is simply inapposite. The majority's use of district court cases from Ohio and Connecticut, *Matje* and *Guglielmoni,* is also unpersuasive; those cases are of little authority and neither contains a considered discussion of the present issue.

### III.

Because this complaint fails to allege facts amounting to the required "deliberate indifference" standard, it should be dis-missed. *Estelle v. Gamble* expressed its "deliberate indifference" standard as a special case of the "wanton infliction of pain" standard of *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton' infliction of pain" prohibited by *Gregg. Estelle v. Gamble* at 291. Thus, "deliberate indifference" requires *wanton,* not merely negligent, behavior for liability to accrue. "Wanton" behavior has uniformly been interpreted as more egregious than even gross negligence. Prosser, *Law of Torts,* 4th Ed. at 184. No such behavior is alleged here. Certainly the defendant's failure to take the expensive steps alleged by the plaintiff as required to avoid an eighth amendment violation (acquiring many more guards, expensive T.V. monitors, special psychiatric training for jail personnel, etc.) cannot be wanton behavior. Neither does anything else alleged here potentially amount to wantonness.

Far from making out a claim of deliberate indifference, the complaint states at most a claim of marginal negligence, as is made clear by *White v. United States,* 4th Cir.1963, 317 F.2d 13, *on remand,* D.Va. 1965, 244 F.Supp. 127, *aff'd,* 4th Cir.1966, 359 F.2d 989. In *White,* Meeks was an inmate in a Veterans Administration psychiatric hospital. Before entering the hospital, he had attempted to commit suicide four times, of which the hospital had records. Meeks complained to the hospital personnel that he was again becoming suicidal and asked to be tied down to his bed. Dr. Parks, the staff physician in charge of Meeks' ward, refused Meeks' requests for restraint. Parks admitted that he was not familiar with Meeks' prior attempts at suicide nor with the fact that Meeks had asked to be restrained for similar reasons some months before. Meeks, as Parks knew, was on Thorazine, a tranquilizer. Meeks continued to complain to Dr. Crowgey, who also had not been apprised of Meeks' prior attempts to commit suicide and who also refused to restrain Meeks.

Crowgey was the last person to see Meeks alive; he committed suicide by standing in front of an oncoming train. Meeks' executor sued the United States in negligence under the Federal Torts Claim Act. Although the district court was moved by the tragedy of Meeks' death, the hospital was found not to be negligent. "To hold with the plaintiff in this case would stress close observation, restriction and restraint, all of which have fallen into disrepute in modern mental hospitals ...." 244 F.Supp. 134.

I repeat myself to say yet again that the complaint in the present case makes out at most a claim for negligence. It is clear that the Veterans Hospital in *White* was given at least as much notice as the Houston jail in this case. In addition, the hospital was expressly designed to screen and treat mentally ill patients. We deal here with lay persons, policemen and jailers, not doctors. Yet, the hospital was held not to have been even simply *negligent* in failing to take suicide prevention precautions with respect to Meeks. Perhaps *White* may be considered a close negligence case, but the standard of care in the present case is *wantonness*. Where a complaint makes out at most a marginal claim for negligence, it cannot be said that it states a claim for "deliberate indifference" under *Estelle v. Gamble*.[1]

## IV.

Because a thorough analysis of the important considerations in this case reveals substantial differences between suicide and ordinary medical problems, I specifically dissent from the majority's refusal to ac-

knowledge the distinctions between the right to suicide prevention and the right to ordinary medical care under *Estelle v. Gamble.*

*Estelle v. Gamble* does not require that we equate cases involving a heightened potential for harassment and abuse with cases of physical or mental illness not so susceptible to prisoner manipulation. The Partridges' suit against the individual defendants here points out the potential for abuse in the majority opinion. Under the majority's ruling the prisoner who "attempted suicide" twice in *Bentvena* would have been able to make the prison officials defend a section 1983 action for his self-inflicted damages sustained in his second "suicide attempt." The majority's position would have permitted the plaintiff there to state a claim by alleging that his first "attempt" put the prison and its officials on notice that he might make a second "attempt" on his own life just as Michael's behavior and record in this case has been held to permit the claims against the Houston Chiefs of Police, B.K. Johnson and Lee Brown, the Chief of the Jail Division, K.L. McBurnett, and his predecessor to go to trial.[2] The fact that the officials and the prison in *Bentvena* might have defended themselves from such a suit with psychiatric testimony that the "attempts" were not *serious* attempts would not have spared the officials there from the harassment of a contrived and manipulative suit. While contrived suits concerning physical illness are not impossible, the potential for abuse in cases involving suicide is clearly greater.

---

1. We note that the suicide prevention measures termed "reasonable" by *State Bank* would not have prevented Michael's suicide in this case.

2. While I agree with the majority's decision to affirm the dismissal of the claim against Officer Morris on the grounds that the complaint states at most a claim of negligence, I find it revealing that the majority can offer no principled distinction between the allegations against Morris and those against the other defendants in this case. Morris was the only defendant who had actual knowledge of Michael's behavior at the time of Michael's death; indeed, the Partridges' primary argument is that their son's behavior in Morris's presence was allegedly so "bizarre" that the fail-

ure to take measures against the likelihood of suicide revealed by this behavior constitutes "deliberate indifference to serious medical needs." Yet the majority allows the claim against Houston but bars the claim against Morris himself, and offers no principled grounds for the distinction. To dismiss the claim against Morris may spare the majority from immediately facing the fact that its decision exposes a wide range of police and prison personnel in positions substantially similar to Morris's to unwarranted liability and the threat of harassment, but that is just what the majority's decision does.

There is little doubt that the lax standards adumbrated by the majority give to the prison population a powerful tool for the annoyance and harassment of prison authorities. It is exactly the potential for such ill-conceived results for which the Court has cautioned us to avoid undue interference with the prisons: "[C]ourts are ill-equipped to deal with the increasingly urgent problems of prison administration ...." *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

In addition, we should be restrained in applying *Estelle v. Gamble* here to limit the discretion of prison authorities, because even genuine suicidal desires are not *per se* a medical condition. It is certainly true that suicidal desires *may* coincide with mental illness, but "the mere fact of suicide, standing alone, does not prove mental illness ...." *Stepp* at 454. In many cases suicide will not indicate a psychiatric problem. Our approach should recognize that the issue in those cases is to what extent a prison is required to prevent a prisoner from inflicting pain on himself independently of any mental health considerations.

That it is unwise to classify suicidal attempts with other possible symptoms of mental illness is evidenced, especially in this Texas jail case, by their severance under Texas law. Texas law provides for continuous observation and eventual commitment to medical facilities of a wide class of mentally ill prisoners. Tex.Rev.Civ.Stat. Ann. art. 5115 (Vernon Supp.1980). However, under Texas law "mental disease or defect" does not include an abnormality manifested *only* by suicide although Texas does permit a finding that "mental disease or defect" may be brought on by drugs or alcohol. *Wright v. Wagner.* There is no reason to suppose that Texas has denied protection to suicidal prisoners without penological purpose while benevolently extending such protection to those who bring about their own illness by use of drugs and alcohol. Rather, in all likelihood, experience has indicated that extension of art. 5115 to cases where illness is indicated only by suicidal attempts creates substantial problems in administering the penal system, just as common sense predicts it would.

## V.

The majority believes that their decision is a consequence of what they term the eighth amendment reaching some acts of "deliberate self injury." I take exception if by "deliberate self injury" the majority means to include the self-injury that is not a product of mental illness. Where the state has no actual knowledge of a prisoner's considered decision to take his own life, there can be no "state action" causing the suicide under the fourteenth amendment unless that term is to be drained of coherent meaning. In such circumstances suicide is no more a medical problem than homicide is a medical problem in the absence of mental illness. Where the prisoner is cogent and the state unknowing, it is not possible to argue seriously that there has been state action through any official aid or encouragement.[3] *Moose Lodge Number 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). The mere fact that the prisoner is subject to state control does not render his own act state action.

## VI.

My considerations of the method of analysis, the use of precedent and the practical consequences of the majority opinion dis-

---

**3.** Where the prisoner does not suffer from a mental illness so severe that he is unable to control himself or form a coherent intent, state liability should be blocked by the common law *in pari delicto* defense at least where the state is without actual knowledge of the prisoner's intent to commit suicide. "Generally speaking, ... I would deny recovery where plaintiff and defendant bear substantially equal responsibility for injury to one of them ...." *Perma Life*

*Mufflers v. International Parts*, 392 U.S. 134, 146, 88 S.Ct. 1981, 1988, 20 L.Ed.2d 982 (1968) (concurring opinion of White, J.); *THI-Hawaii v. First Commerce Financial Corp.*, 627 F.2d 991 (9th Cir.1980). In the present case nothing has been alleged which indicates that Michael's "mild" brain syndrome deprived him of the ability to form a coherent intent. Accordingly, the applicability of the *in pari delicto* defense is obvious from the face of the pleadings.

cussed above lead me to believe that it is a fundamental error to consider cases of prisoner suicide as cases of medical need; I believe the correct approach is to view suicide cases as analogous to cases involving prisoner attacks on their fellow inmates. The eighth amendment may impose a duty on state prisons to protect inmates from their own hands in certain very limited circumstances. It does not follow, however, that this case should be treated as involving ordinary medical needs. The Seventh Circuit recognized in *State Bank* that, although there may be a medical *component* to some suicide cases, these cases primarily involve matters of prisoner *conduct* over which the prisoner may have control. Accordingly, *State Bank* correctly held that cases in which the prisoner is the victim of his own violence are most analogous to those in which the prisoner is the victim of the violence of a fellow inmate. *State Bank* requires allegations of "such ... callous indifference that an official intent to inflict unwarranted harm may be inferred" in both cases involving suicide and cases of attack by other inmates.

It is *State Bank*'s approach, as well as its standard and holding, which is important here; by focusing on precedent involving prisoner attacks, the Seventh Circuit avoids the conceptual confusion in equating suicide cases with cases involving the need for ordinary medical care. The present majority acknowledges the importance of *State Bank* only in form, but departs from the substantive reasoning underlying that case. I believe that it is important that we avoid the conceptual confusion present in the majority opinion from which *State Bank* wisely drew back. In sum, I would treat this case essentially as I would treat a prisoner assault case and because no facts are alleged which remotely imply "an official intent to inflict unwarranted harm," I would affirm the dismissal of the complaint.

## VII.

In conclusion, because the complaint in this case fails to state a claim under *Estelle v. Gamble*, because the majority fails to perceive the subtle but very serious differences between the right to suicide protection and right to ordinary medical care, and departs from established precedent, I respectfully dissent.