Elmer Joseph SCHARFENBERGER,
Plaintiff-Appellant Cross-Appellee,

v.

John W. WINGO and Jerry L. Wilson,
Defendants-Appellees Cross-Appellants.

Nos. 75–1297, 75–1298.

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1976.

Decided Sept. 23, 1976.

Rehearing Denied Oct. 21, 1976.

John Allen Taylor, Louisville, Ky., for plaintiff-appellant.

Ed W. Hancock, Atty. Gen., Robert L. Chenoweth, Asst. Atty. Gen., Bruce K. Davis, Frankfort, Ky., for defendants-appellees.

Before McCREE, LIVELY and ENGEL, Circuit Judges.

McCREE, Circuit Judge.

We consider an appeal and cross-appeal from an order of the district court for the Western District of Kentucky granting judgment n.o.v. in a civil rights action based upon 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983. The district court's opinion is reported at 384 F.Supp. 1269 (1974). Plaintiff-appellant Elmer Scharfenberger was a prisoner at the Kentucky State Penitentiary at Eddyville. He alleged in his complaint that he suffered two amputation operations to his right arm because he was denied adequate medical treatment during his incarceration. The defendants and cross-appellants are John Wingo, former Warden at the penitentiary, and Jerry Wilson, former Associate Warden for Treatment. The case was tried before a jury, which awarded Scharfenberger verdicts of $15,000 each against Wilson and Wingo. Defendants Wilson and Wingo moved for judgment n.o.v., or, alternatively, for a new trial. The district court entered judgment in favor of defendants notwithstanding the verdict. Subsequently he denied their motion for a new trial.

On appeal, Scharfenberger contends that the district court erred in entering judgment n.o.v. because the evidence was sufficient to support the jury verdict. Wilson and Wingo cross-appeal. They contend that even if the district court erred in entering judgment in their favor, the verdict should not be reinstated, and that they are entitled to a new trial because of the trial court's prejudicial errors in permitting the introduction of the unauthenticated "admission note," and in permitting repeated references to negligence, which was not at issue.

Scharfenberger was injured on February 20, 1972, as a result of the injection of an irritating substance into his right arm. He testified that he had gone to the prison hospital for treatment of flu symptoms on February 20, and that an inmate nurse gave him a tetracycline capsule and a syringe with which to inject it. He testified that he did not give himself the injection, or know who had, because he lost consciousness as he was leaving the hospital with the capsule. Scharfenberger testified that when he regained consciousness, the capsule was gone and his arm was swollen, painful, and partially paralyzed. He thought he had been given an injection. However, Dr. Talley, who performed the first amputation, testified that Scharfenberger told him that he had injected what he believed to be tetracycline dissolved in water into his own arm. Dr. Reeder, who performed the second amputation, testified that Scharfenberger told him that he had dissolved a capsule of tetracycline and had injected it into his arm. Defendants expend considerable effort seeking to prove that Scharfenberger injured himself. We regard this issue as irrelevant because a prisoner's custodians cannot lawfully deny him adequate medical care even in instances of deliberate self injury.

Several hours later, Scharfenberger was admitted to the prison hospital. He testified, however, that he had no recollection of anything that occurred for the next three days. He was treated in the prison hospital by Dr. Max Salb, the prison physician, who died before the trial of the case. Scharfenberger's hand and arm became gangrenous, and eleven days later, on March 1, 1972, he was removed to Caldwell County Memorial Hospital, where Dr. Talley amputated the right arm two inches below the elbow. The next day, Scharfenberger was returned to the prison hospital. Dr. Salb had just resigned, and Scharfenberger testified that he was not seen by any physician until three days later when Dr. Hyde assumed Dr. Salb's position.

The stump of Scharfenberger's arm did not heal, and it developed a chronic infection. On May 30 at the Western Baptist Hospital, Dr. Reeder performed a second amputation operation, this time above the elbow.

Scharfenberger was released from prison in December, 1972. Since then he has had a third operation on his arm, and he has been advised that a fourth operation will be necessary.

The complaint alleged that the prison hospital was not adequately equipped to handle Scharfenberger's injury and that the prison officials denied Scharfenberger adequate medical care through "obvious neglect and intentional abuse." This deprivation of medical care, Scharfenberger charged, was "under color of law," and it "subjected him to a deprivation of rights secured by the Constitution and laws [of the United States]."

In *Fitzke v. Shappel,* 468 F.2d 1072, 1076 (6th Cir. 1972), Judge Miller stated the principles equally applicable here:

> . . . An individual incarcerated, whether for a term of life for the commission of some heinous crime, or merely for the night to "dry out" in the local drunk tank, becomes both vulnerable *and* dependent upon the state to provide certain simple and basic human needs. Examples are food, shelter, and sanitation. Facilities may be primitive but they must be adequate. Medical care is another such need. Denial of necessary medical attention may well result in disabilities beyond that contemplated by the incarceration itself. The result may be crippling injury, as alleged here, or, as the *Stiltner* court pointed out, the very deprivation of life itself, since, *restrained by the authority of the state,* the individual cannot himself seek medical aid or provide the other necessities for sustaining life and health.
>
> Thus it is that fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury. This is not to say that every request for medical attention must be heeded nor that courts are to engage in a process of second-guessing in every case the adequacy of medical care that the state provides. But where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process. *Hughes v. Noble, supra; McCollum v. Mayfield, supra.* [Footnote omitted.]

More recently, in *Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir. 1976), we interpreted *Fitzke* as holding that

> prison authorities may not be deliberately indifferent to the suffering of prisoners under their care. . . . [A] prisoner states a proper cause of action when he alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury. [Footnotes omitted.]

In *Westlake* we observed that where a prisoner has received medical treatment the courts will not ordinarily "second guess" the physicians, but "in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." At 860–61 n.5. Accordingly, Scharfenberger's complaint states a cause of action, since these authorities make it clear that due process protects the individual against arbitrary treatment that causes the loss of a limb.[1]

The trial court entered a pretrial order, agreed to by the parties, limiting the proofs to the following issues:

(a) Whether the plaintiff's injury could have been treated successfully and whether said treatment would have reasonably been anticipated to save his arm or any part thereof.

(b) Whether the attending physician made any recommendations for treatment of plaintiff's injury or any recommendations which could reasonably be anticipated to have led to treatment of his injury, any of which any of the joint

---

1. The common law recognized how critical the loss of a limb would be; traditionally mayhem was defined as "[u]nlawfully and violently depriving another of the use of such of his members as may render him the less able in fighting. . . ." Black's Law Dictionary (rev'd 4th ed. 1968).

defendants failed to follow, or, in fact, denied.

(c) Whether any decisions made by any of the joint defendants pertaining to recommendations made by the attending physician resulted in the loss of plaintiff's arm or any part thereof. 384 F.Supp. 1271.

The court also stated that "these issues were further refined and solidified into two controlling questions" before the case went to trial:

(1) Whether any physician made recommendations or requests to the prison officials concerning plaintiff's treatment which were refused or disregarded; and (2) Whether such refusal, if it in fact occurred, resulted in a residual injury to plaintiff which could have been prevented or lessened by more timely attention. 384 F.Supp. 1271.

In considering the defendants' motions to set aside the jury's verdict in favor of plaintiff, and to enter judgment for defendants n.o.v. or to order a new trial, the district court observed that it had the authority to set aside a jury verdict that was "contrary to the clear weight of the evidence," in order to "prevent a miscarriage of justice." 384 F.Supp. 1271. Applying this standard, the district court turned first to a review of the evidence supporting Scharfenberger's claim that the defendants disregarded or refused to follow medical advice about his treatment. The court observed that Scharfenberger relied in part upon a document described as an "admission note" prepared by the late Dr. Salb. Scharfenberger relied upon the note as proof that Salb had advised the defendants, who disregarded his recommendation, that the condition of Scharfenberger's arm was serious and required that he be moved to an outside hospital for treatment. The note, dated February 20,[2] stated:

I saw the above patient 2–22–72 at 2:10 A.M. because of extreme swelling in his right arm and hand. I asked him what happened and he told me he shot himself with a yellow jack, but didn't get in the vein. That is why his [hand] * arm hurt him so.

The fingertips of his right hand were black and scored as if they were burned. No pulsation in any of his finger or hand. At one-thirty I notified the Warden that this man should be sent to another hosp. because we were not equipped to remove his hand or arm.

Pulsations of both ulnar and radial arteries were not felt. This told me that his circulation was impaired at the elbow. Heat and light warmth was applied but to no avail. He was then after one week sent to the Caldwell Hospital for consultation.

I called Dr. Talley 2–25–72 about this man and he said he would see him immediately—I talked to the Warden and he said how long will he be in the hosp. I told him I didn't know. If they had to remove his hand or arm he may have to stay a week.

Today I talked to Dr. Talley and he told me he had to remove his right arm 2 inches below his elbow. He will be released at 2:30 or 3:00 P.M. and to return to this hosp.

The trial court characterized the note as "of highly questionable authenticity," observing that "[o]n its face, alterations of material dates are clearly evident," and in addition it was not signed. 384 F.Supp. 1272. The court held that the "plain meaning" of the note neither expressed nor implied urgency. It was held that from the note,

standing alone, the jury could not reasonably conclude that defendants refused or delayed in granting their approval for plaintiff's transfer to the outside medical facility. 384 F.Supp. 1272.

The court observed the "patent inconsistency" between the testimony of Dr. Talley that he first spoke to Dr. Salb on February 29, and the statement in the note dated February 25. The court stated that Dr. Talley's testimony made it "clear" that Dr.

---

2. The original date appeared to have been erased.

* The word hand appears but is crossed out in the original document.

Salb was uncertain about the need for an amputation and that he "believed he was following correct medical procedure." The district court found Talley's testimony consistent with defendants' contention that they first received medical advice that Scharfenberger should be moved on February 29, the day he was taken to see Dr. Talley. The court disregarded the testimony of inmate Maples, who said that he asked Wingo to remove Scharfenberger for treatment, because Maples was not qualified to give medical advice.

With regard to the second issue tried, the trial court held that the

> overwhelming, preponderant, expert opinion [was that] within a very short time after the event, the pathological process which resulted in gangrene became irreversible and amputation was inevitable. 384 F.Supp. 1273.

It held that the second amputation operation was necessary because the first surgery was undertaken conservatively in an unsuccessful effort to save Scharfenberger's elbow.

The district court concluded that there was "insubstantial" evidence of a knowing failure or refusal to provide needed medical care, with a residual injury resulting. It entered judgment for the defendants n.o.v. because use of its duty "not to allow a verdict to stand which is against the great weight of evidence in the case, a verdict which a reasonable jury could not have reached." 384 F.Supp. 1274.

## I. WAS JUDGMENT N.O.V. PROPER?

In *Reeves v. Power Tools, Inc.,* 474 F.2d 375, 380 (6th Cir. 1973), we stated the standards applicable to judgment notwithstanding the verdict:

> Judgment notwithstanding the verdict is not proper unless the evidence is such that there can be but one reasonable conclusion as to the proper verdict. *It should not be granted if there is a conflict in the evidence, and credibility of evidence is not to be considered in passing on a motion for judgment. Greer v. United States,* 408 F.2d 631 (6th Cir.

1969); Moore's Federal Practice, Par. 50.-07(2) (Second Edition). [Emphasis added.]

The question here is whether there was a material issue of fact to be decided by the jury, and the "standard remains the same when the trial court's decision is reviewed on appeal." *O'Neill v. Kiledjian,* 511 F.2d 511, 513 (6th Cir. 1975).

Applying this standard, we hold that the district court erred in granting judgment n.o.v. for the defendants. As its opinion demonstrates, the trial court presumed to resolve conflicts in the evidence. The court found an "inconsistency" between the admission note and the testimony of Dr. Talley, and it resolved this conflict in defendants' favor, crediting Dr. Talley's statement. The court buttressed its conclusion with the observation that the note was "of highly questionable authenticity," and that it appeared to have been altered. However, the note had been admitted into evidence, and its weight was a matter for the jury to consider in view of the authentication evidence and the appearance of the note itself.

The trial court also held that the "plain meaning" of the admission note conveyed no urgency, either express or implied. We think that an inference of urgency in the communication to the Warden could reasonably have been drawn, and that the choice of inferences was within the province of the jury. One reasonable interpretation of the note is that on the 22nd Dr. Salb saw Scharfenberger early in the morning, and that at 1:30 p. m. the same day he "*notified the Warden that the man should be sent to another hosp. because we were not equipped to remove his hand or arm.*" [Emphasis added.] The jury could reasonably conclude that Salb described the situation as urgent, because even at this early date he referred to the possibility that an amputation might become necessary.

Moreover, the record contains other evidence which also supports the jury's verdict. Scharfenberger's testimony controverted Wilson's and Wingo's statements that they were first informed of Scharfenberger's

condition by Dr. Salb on February 29, that they accepted his medical advice immediately, and sent Scharfenberger out of the hospital for examination and treatment. Scharfenberger testified that before the first amputation, Wingo visited the prison hospital when Salb was not present. Scharfenberger testified that Wilson ordered the inmate nurses to remove his arm from the heat treatment which Dr. Salb had prescribed, and to place his arm in a bowl of ice that Wilson himself had brought to the hospital. Scharfenberger also testified that on a second occasion before the first amputation, Wilson and Luckett visited the prison hospital when other inmates caused a disturbance because the prison administrators had refused to send Scharfenberger out of the hospital for treatment. Scharfenberger stated that he tried to talk to Wilson about his need for outside treatment, but

> Wilson claimed he didn't have the authority to send me out. He claimed that it was up to Mr. Wingo, and Mr. Wingo said he didn't have the authority, and it was up to Mr. Holmes, and I couldn't see Mr. Holmes or Mr. Luckett.

Finally, Scharfenberger also testified that after the first operation Dr. Hyde, who replaced Dr. Salb, asked several times that Scharfenberger be sent out for treatment, but "Wingo wasn't going to let me out." Scharfenberger said that Hyde stated that "Wingo and them, it was up to Wingo and them, and he [Hyde] couldn't get no satisfaction out of them."

If the jury credited this evidence instead of evidence that conflicted with it, and drew permissible inferences favorable to Scharfenberger, it could reasonably have concluded that Wilson and Wingo disregarded both Salb's and Hyde's medical advice, and that they initially refused the physicians' requests that Scharfenberger be transferred to an outside medical facility for treatment. Much of Scharfenberger's evidence is circumstantial or even tangential, but Salb's death before the trial removed the only direct and most reliable source of the truth.

The second issue that the district judge considered in granting the motion for judgment n.o.v. was "whether or not timely medical attention could have saved any part or portion of plaintiff's arm." The district court concluded that the "overwhelming, preponderant" expert testimony established that the processes which led to gangrene became irreversible "a very short time" after the injection, and amputation became inevitable. Most of the testimony that the injury was irreversible was based upon the assumption that the initial injury was an *intra-arterial* injection of an irritating substance, probably tetracycline. However, a review of the medical testimony reveals that after Dr. Kurtz and Dr. Kleinert reviewed the pathology report prepared after the first amputation, both testified that the pathology report was not consistent with the assumption that there had been an intra-arterial injection.

Dr. Kurtz testified that the pathology report indicated that the injection was probably around the blood vessels, not in them. He also stated:

> *The injection around the vessels could have been reversed or possibly have been reversed* by proper treatment and by using vasal dilators, by possibly even exploring the wound, by doing nerve blocks and things like this, you could possibly have reversed the process. [Emphasis added.]

Even during earlier testimony, given before he had seen the pathology report, Dr. Kurtz testified that assuming that there had been an inter-arterial injection, with proper treatment (including a fasciotomy when swelling began, low molecular weight Dextra, and stellate blocks or a continuous sympathetic block) a patient would "probably" still lose his arm, but below rather than above the elbow, and under the best conditions, the patient might lose only his hand. He also testified that if Scharfenberger's hand showed signs of "wet" gangrene three or four days after the injection, the amputation should have been performed immediately. The amputation was not performed until eleven days after the injection.

Dr. Kleinert testified that the pathology report was not consistent with the intra-arterial injection. He thought that the injection had been deep in the muscle, and that the interruption of Scharfenberger's circulation resulted from his lying on his arm for a very long period of time, to the point that the blood supply occluded, while he was unconscious. He stated that if Scharfenberger had been conscious, he would not have been able to lie on his arm for this length of time because of the pain.

Thus the "overwhelming, preponderant" medical testimony may be said to show that an amputation would probably have been necessary if an irritant had been injected into an artery. But the evidence does not conclusively establish that prompt medical treatment could not have saved a greater portion of Scharfenberger's arm. The jury could, if it chose, have believed Dr. Kurtz's testimony that proper treatment would have saved the elbow and might have saved the forearm as well. Moreover, there was other expert testimony, which the jury was free to credit, that the injection was not in, but near the vessels, and that this kind of injury "could have been reversed."

## II. ARE DEFENDANTS ENTITLED TO A NEW TRIAL?

On cross-appeal defendants contend that even if the district court erred in entering judgment n.o.v., we should order a new trial rather than reinstate the verdict. They contend, first, that the admission note was improperly admitted because it was not authenticated in accordance with K.R.S. 422.-120.[3] Second, they contend that the jury's verdict was improperly influenced by Scharfenberger's repeated introduction of matters relevant only to medical malpractice, and not to whether defendants refused to follow medical advice. We disagree.

## A. THE ADMISSION NOTE.

Defendants contend that the testimony of the questioned document expert, Maxwell Allen, was not sufficient to establish that the admission note was written by Dr. Salb as Scharfenberger contends. They urge that K.R.S. 422.120 permits the introduction of other writings of the purported author of a challenged document only after it has been shown to the satisfaction of the trial judge that these other writings are genuine, that no fraud was practiced in their selection, and that they were written before any controversy concerning authenticity arose. Defendants urge that under K.R.S. 422.120 the admission note was improperly admitted because none of the examples of Dr. Salb's other writings were introduced into evidence and shown to satisfy these standards. Instead, they contend, Allen simply gave his opinion that the note was written by Dr. Salb, and under Kentucky law expert testimony is not sufficient for authentication.

Defendants' reliance upon Kentucky law is misplaced. Under the doctrine of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal law governs procedural matters, including the procedure for the authentication of challenged documents. For example, 28

---

3. K.R.S. 422.120 provides:

(1) When, in any civil or criminal action, there is any dispute as to the genuineness of the handwriting of a person, other handwritings of that person may be introduced for the purpose of comparison by witnesses with the writing in dispute. Such writings and the testimony of witnesses respecting them, may be submitted to the court or jury as evidence concerning the genuineness of the writing in dispute.

(2) Before such writings are admitted their genuineness must be proved to the satisfaction of the judge, by other than opinion evidence and it must be proved, to the satisfac-

tion of the judge, that they were written before any controversy arose as to the genuineness of the writing in dispute, and that no fraud was practiced in their selection. A party proposing to introduce such writings must give reasonable notice of his intention to the opposite party, or his attorney, with reasonable opportunity to examine them before the commencement of the trial. The judge may limit the number of such writings. An error of the judge shall be subject to revision and correction in the same manner as if the error had been committed by the court.

U.S.C. § 1731 governs the admissibility of handwriting exemplars which are to be compared with a challenged document to authenticate it.[4] In addition, Rule 901 of the new Federal Rules of Evidence (which were not in effect at the time of this trial) deals specifically with the "Requirement of Authentication or Identification." It states:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

\* \* \* \* \* \*

(3) Comparison by trier or expert witness. Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

▪ Under federal law the trial judge has the responsibility to determine whether the genuineness of the handwriting on the exemplars is sufficiently proved. *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 193 (3d Cir. 1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971). Specimens must be proved to be genuine to the satisfaction of the court, and an appellate court will reverse a ruling only if it is not fairly supported by the record. *United States v. White*, 444 F.2d 1274, 1280 (5th Cir. 1971), *cert. denied*, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971). As the Fifth Circuit stated in *United States v. White, id.*:

There is no precise method by which a specimen must be proved to be genuine and the proof may be either direct or circumstantial. *Dean v. United States*, 246 F.2d 568, 576 (5th Cir. 1917). The

courts have not restricted the manner in which specimens may be proved genuine and each case must be viewed on its own facts. See Annot. 41 A.L.R.2d 583, 589 (1955).

The district court was well aware of the requirement that the exemplars be authenticated before they could be used as a basis for Allen's opinion testimony regarding the authenticity of the admission note. The court stated:

The question, of course, is to establish beyond peradventure of doubt Doctor Salb's handwriting in order that the expert might utilize his talents and determine whether or not this particular questioned document contains his handwriting. Now, to do that, in order to do it properly, we must first ascertain unquestionably and from a source that's absolutely reliable that we have his absolute writing. Now we don't have anything— then these gentlemen would have an opportunity to question it, cross-examine on it. . . .

The exemplars on which Allen based his testimony were copies of two employee's withholding exemption certificates signed "Max C. Salb, M.D.," Salb's job application including the certificate of appellant signed "Max C. Salb, M.D." and Salb's signed letter of resignation. Allen had viewed the originals of these documents in the files of the Department of Correction and the Personnel Department in the state capital, Frankfort. Since Allen had no authority to remove the originals from the files, he made copies which he brought with him to the trial, and to which he referred in his testimony.[5]

▪ When the trial judge overruled the objections to Allen's testimony of his comparison of these exemplars to the admission note, and his conclusion that Dr. Salb wrote the admission note, the judge by implication indicated that he was satisfied

---

**4.** 28 U.S.C. § 1731 provides:

The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person.

**5.** Apparently neither party chose to introduce the exemplars into evidence.

that the exemplars of Salb's writing were genuine. *United States v. Greiser,* 502 F.2d 1295, 1298 (9th Cir. 1974). As the Fifth Circuit observed in *White,* circumstantial evidence may be used to prove the genuineness of exemplars. Here the exemplars were taken from documents from the state's official files, which were prepared long before the litigation began. Moreover, the documents were taken from the files of the Commonwealth of Kentucky, which had been the employer of all the defendants here. There was no evidence tending to show that the documents were not written by Dr. Salb. In these circumstances, the record adequately supports the trial court's implicit ruling that the exemplars were genuine samples of Dr. Salb's handwriting.

Since the exemplars were properly authenticated, the trial court did not err in admitting the admission note after Allen compared it with the exemplars and testified that in his opinion the admission note was also written by Dr. Salb.

**B. EVIDENCE OF NEGLIGENCE.**

▬▬▬ Defendants also claim that they were prejudiced by Scharfenberger's introduction of evidence irrelevant to the issues designated in the agreed pretrial order, but relevant to Scharfenberger's claim for medical negligence, which the district court had dismissed before trial. Many of defendants' specific objections require little discussion. For example, defendants' first illustration is a reference to the inadequacy of the prison hospital by Scharfenberger's counsel. But as defendants' own brief recognizes, on their direct examination of Dr. Hyde, a defense witness, they also questioned him about the adequacy of the prison hospital. Additionally, defendants objected to Scharfenberger's cross-examination of Dr. Hyde, in part because Scharfenberger focused on Hyde's medical training. Since Hyde testified as a medical expert, this line of questioning was entirely appropriate.

In general, defendants objected to the admission of the testimony of plaintiff's witnesses other than his medical experts— Scharfenberger's father, his two sisters, his wife, and three of his fellow inmates. Defendants argue that none of these witnesses had any medical training, and that their conversations with defendants and their observations of the care Scharfenberger received could not prove that defendants disregarded *medical* advice, or that their disregard caused Scharfenberger to lose his arm or a part of his arm.

None of this testimony unfairly prejudiced defendants. The testimony of Mary Mascio, Scharfenberger's sister, was very brief and had minimal, if any, impact. Scharfenberger's wife's testimony referred primarily to her communication with Commissioner Holmes, who was also a defendant, and it in no way prejudiced the case against Wilson and Wingo.

Scharfenberger's father and his sister, Dorothy Kiger, testified that they communicated with Wilson immediately after the first amputation operation. Scharfenberger's father testified that Wilson told him that it was necessary to bring Scharfenberger back to the prison very shortly after the operation because "it's necessary to leave— to have two guards and [he] said they couldn't stand this, you know, the pressure, the financial pressure. . . ." If the jury credited this testimony, it would help to establish a reason why Wilson and Wingo had refused to send Scharfenberger to an outside hospital on Dr. Salb's advice. Nor is the relevance of this testimony diminished by the defendants' attempts to counter it with testimony of Dr. Talley, who stated that he felt that Scharfenberger could be returned to the prison the day after the operation. Talley testified that he made this decision with Dr. Salb on the basis of

> a working arrangement that patients be returned as soon as medically feasible. My understanding, with the shortage of guards, prison personnel, that is their desire, and consequently, we try to return the patients as soon as possible under the medical supervision at the hospital.

This portion of Talley's testimony supports Scharfenberger's contention that the prison administrators were inordinately concerned

with the expense involved in sending prisoners outside the hospital for treatment.

The testimony of inmate Maples, which defendants also contend is irrelevant to the agreed issues, supplied evidence of a second reason why defendants might have refused initially to follow Salb's advice to send Scharfenberger to an outside hospital for treatment. Maples testified that before the first amputation he asked Wingo to send Scharfenberger outside the hospital for treatment, and Wingo told him that he would not send Scharfenberger out because his injury had been self-inflicted and accordingly *he deserved the consequences.* Maples stated that he remonstrated with Wingo that Scharfenberger might lose his arm as a result, but Wingo was unmoved. Maples stated that this conversation took place on February 24 (five days before the amputation, and two days after the date on which the admission note suggests that Salb first requested Wingo to send Scharfenberger for outside treatment).

Finally, defendants contend that the testimony of inmates Ault and Jones was irrelevant and prejudicial. We disagree. Ault testified to the circumstances immediately after Scharfenberger's injury. As both he and Scharfenberger testified, he found Scharfenberger outside of the prison hospital shortly after Scharfenberger had apparently received the injection. This testimony was obviously relevant to corroborate Scharfenberger's testimony of the nature of his initial injury and of the circumstances surrounding it. Ault also testified that he had prepared a habeas petition for Scharfenberger before the first amputation, based upon information conveyed by an intermediary from Scharfenberger in the prison hospital. The petition, which Ault testified was drawn up before the first amputation, stated that Salb saw Scharfenberger on February 22 and recommended to Wingo that Scharfenberger be sent for outside treatment, but Wingo refused to make the arrangements. This testimony would tend to refute the defendants' contention that Scharfenberger had recently fabricated the story that Wingo and Wilson had been advised that he needed outside treat-

ment by Salb on the 22nd, but that they refused to follow this recommendation. Part of Jones' testimony concerned Luckett, rather than Wilson and Wingo. In addition, he gave testimony that would also tend to show that Scharfenberger's testimony at trial was consistent with his statements at the time of the events in question. Jones testified that Scharfenberger told him that he was not receiving proper treatment and was in great pain, and he asked Jones to help him get a message to his wife to get an outside doctor sent in. Jones stated that he and the other inmates were very worried about Scharfenberger and that they even considered taking up a collection to buy him some medicine.

█ We hold that although the challenged testimony was prejudicial to defendants' case in the sense that it assisted in establishing their liability, the evidence was not irrelevant, and it was properly admitted. Therefore, this contention provides no ground for a new trial.

### III. CONCLUSION.

Accordingly, we hold that the district court erred in granting judgment in defendants' favor notwithstanding the verdict, and that defendants were not prejudiced by the admission of either the admission note or the testimony that they challenged. The district court has already considered and denied appellants' motion for a new trial. Therefore, the case will be remanded to the district court for entry of judgment on the verdict.

**REVERSED AND REMANDED.**