Ralph PARTRIDGE and Betty Partridge,
Plaintiffs-Appellants,

v.

TWO UNKNOWN POLICE OFFICERS
OF the CITY OF HOUSTON, TEXAS,
et al., Defendants-Appellees.

No. 83–2615.

United States Court of Appeals,
Fifth Circuit.

June 13, 1986.

John P. Mustachio, Houston, Tex., for plaintiffs-appellants.

Mary Madigan Dinan, Houston, Tex., for City of Houston and Houston Police.

D. Reid Walker, Houston, Tex., for Morris.

Before WISDOM, RANDALL and JOLLY, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiffs/appellants, Ralph and Betty Partridge, assert a claim under 42 U.S.C. § 1983 arising from the suicide of their son, Michael, while he was a pretrial detainee in a municipal jail in Houston, Texas.[1] We withdrew our initial opinion,[2] and now substitute this opinion restating our reasons for reversing and remanding this case to the district court.

The district court erred in dismissing the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. We read the complaint as amended as alleging that the defendants had deliberately adopted a policy that constituted indifference to the medical needs of detained persons and, pursuant to policy, failed to render reasonable medical aid to Michael Partridge and to persons similarly subject to suicidal tendencies; that this failure was not the result of an individual act of negligence but was the result of systematic indifference to the serious medical needs of pretrial detainees and of a "deliberate pattern of conduct", that is, of a custom or policy. Those allegations go beyond negligence and amount to the kind of arbitrariness and abuse of power that is preserved as a component of the due process clause in *Bell v. Wolfish,*[3] a decision underscored in *Daniels v. Williams,*[4] *Davidson v. Cannon,*[5] and *Whitley v. Albers.*[6]

We reverse the holding of the district court that the complaint should be dismissed under Rule 12(b)(6), except as to the dismissal of the suit against Officer James Morris who was guilty of an isolated act of simple negligence. We grant the plaintiffs leave to amend, because arguably the allegations against the City of Houston do not satisfy the requirements established in

1. The plaintiffs also claimed damages under the Texas Survival Statute and the Texas Wrongful Death Act.

2. 751 F.2d 1448 (5th Cir.), *withdrawn,* 755 F.2d 1126 (1985).

3. 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

4. —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

5. —— U.S. ——, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

6. —— U.S. ——, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

*Bennett v. City of Slidell,*[7] and *Pembaur v. City of Cincinnati.*[8]

### I. Facts and Proceedings Below

The pleadings allege the following facts. In February 1980 a Houston police officer arrested Michael Partridge on suspicion of burglary and theft. While being questioned, "due to his fragile emotional disposition, he became hysterical". His father was at the scene of the arrest. A sergeant asked Partridge's father if the boy had any "mental problems". Partridge's father told the officer that the boy had suffered a nervous breakdown and directed his attention to two bracelets Michael wore on his wrists. One bracelet read, "Medical Warning. See Wallet Card"; the other read "Heart Patient". One of the officers "removed the two bracelets and, dangling them in front of the father, told him that if he would obtain a letter from the boy's psychiatrist, attesting to the boy's condition and to the danger of his being confined that the boy would in all likelihood be released." The boy was then forced into the car. He became agitated and violent, and attempted to kick the doors and windows out of the car. The officer, who was working alone at the time, requested a two-man unit to transport Partridge to the Houston jail. When the back-up unit arrived, Partridge was still kicking at the doors and windows.

The two transporting officers, one of whom was Morris, handcuffed Partridge and drove him to the jail. On the way to the jail, Partridge intentionally struck his head at least once against the plexiglass divider between the front and back seats. Morris was able to calm Partridge and by the time they arrived at the jail he seemed composed. Neither of the two officers called anyone's attention to Partridge's aberrant behavior. Partridge was placed in solitary confinement. The complaint stated that the "[d]ecedent was known at the police department to be a mental patient". The particular officers handling his booking, however, were unaware that Partridge's clinical record within the jail showed that Partridge had attempted suicide during an earlier confinement. The records were kept four doors away from the booking desk. The officers did see Partridge's two medical alert bracelets, and noted on Partridge's booking card "heart and mental". Three hours later Michael Partridge hanged himself with a pair of socks tied around the upper bars of his cell.

The original complaint stated: "the deprivation of decedent's rights ... was part of a deliberate pattern of conduct or policy of the Houston Police Department"; "Decedent's death was caused by negligence of both of two unknown officers and the custom or policy in effect at the Houston Police Department". The defendants in the complaint were two unknown Houston police officers and the Houston Police Department. The defendants filed a motion to dismiss on the grounds that (1) the Houston Police Department is immune from suit; (2) the complaint fails to state a cause of action; and (3) the plaintiffs rely on a theory of respondeat superior, a rejected theory in the situation here presented. The plaintiffs filed an answer to the motion asserting that the death of their son "was the result of the systematic policy of the Houston Texas Police Department". They also filed a supplemental complaint stating:

> That in addition to the already pleaded causes of action, the following acts of negligence both of omission and commission be pleaded.
>
> (1) Failure to adequately train the jail personnel to handle arrested citizens with known mental problems.
>
> (2) Failure to provide a policy or method for ascertaining citizens in custody whose mental condition constitutes a danger to themselves or others.

**7.** 735 F.2d 861 (5th Cir.1984) (en banc) (per curiam), *cert. denied,* —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

**8.** —— U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

(3) Failure to provide a policy to provide safe custodial containment for citizens whose known mental condition constitutes a danger to their safety.

(4) Failure of the police to follow any procedure to protect Michael Partridge from self-harm or self-destruction.

Later they filed a "First Amended Original Complaint" alleging violations of their Eighth and Fourteenth Amendment rights. The named defendants in the amended complaint were the City of Houston, the Houston Police Department, and four individuals: B.K. Johnson, Chief of Police in 1980, Lee Brown, Chief of Police in 1983, K.L. McBurnett, Chief of the Jail Division in 1983, and James Morris, a field training officer. The complaint stated that the plaintiffs "will show that the Defendants ... engaged in a deliberate pattern of conduct which constituted the policy of the Houston City Police Department's jail policy for the handling of detained citizens which policy was familiar to the City of Houston".

The complaint as amended rests the claim squarely on the detention center's systemic lack of adequate care for detainees:

Suicide is a known risk of detainees in any detention center; there is no special training given to those police officers at the city jail; there is no written policy or procedure manual; the police personnel have no access to the jail clinic personnel records ... The city jail was inadequately staffed, there were no television monitors; there were no regular cell-checking procedures; and no one on the jail staff was informed of Michael Wayne Partridge's hysterical (and thus bizarre) behavior at the arrest scene and during the drive to jail....

Almost in passing, the plaintiffs alleged that in addition the defendants were negligent. In its brief unpublished order dismissing the complaint the district court did not discuss the plaintiffs' main theory of the case, that is, that Michael's death was caused by the detention center's custom or policy of allowing jail procedures that are callous to the point of deliberate indifference to detainees, especially detainees in need of protection from injuring themselves or others.

The district court held that the plaintiffs failed to state a claim under the "deliberate indifference" standard of *Estelle v. Gamble,*[9] an Eighth Amendment case. Aside from a general reference to that case, the court cited one case in support of its holding:

In light of considerations established by the Court of Appeals for the Fifth Circuit in *Woodall v. Forti* [sic], 648 F.2d 268 (5th Cir.1981), to determine whether the alleged denial amounts to deliberate indifference to the decedent's medical needs, it is the opinion of the Court that the plaintiffs' claim is insufficient to state a claim for relief under 42 U.S.C. 1983 (1976).

It is difficult to understand why the court relied on *Woodall v. Foti.* In that case, the trial judge had denied a prisoner leave to proceed in forma pauperis, holding that the lawsuit was frivolous and that the complaint failed to state a claim. This Court in a per curiam opinion vacated the district court's judgment and remanded the case for proceedings on the merits. The prisoner had alleged that he had been denied medically necessary psychiatric care in derogation of his rights under the Eighth Amendment.

## II. Motion for Dismissal Based on Rule 12(b)(6)

The district court styled its action as a dismissal under Fed.R.Civ.P. 12(b)(6). In reviewing such a dismissal, we may not go outside the pleadings. We accept all well-pleaded facts as true and view them in the

9. 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *Daniels* specifically preserved the callous indifference standard of *Estelle v. Gamble.* —— U.S. ——, 106 S.Ct. at 664, 88 L.Ed.2d at 667.

light most favorable to the plaintiff.[10] We cannot uphold the dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief".[11]

*Estelle v. Gamble* lends little or no support to the dismissal of the Partridges' complaint. *Gamble* holds that the denial of medical care in some circumstances may amount to punishment; that deliberate indifference to serious medical needs of prisoners constitutes "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment; and that a complaint alleging no more than negligence in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. "In order to state a cognizable claim [under the Eighth Amendment], a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." [12]

 *Estelle v. Gamble* applied its standard of medical care to prisoners who had actually been convicted. The holding was based on a convicted prisoner's Eighth Amendment right to be free from cruel and unusual punishment. A pre-trial detainee, however, has a Fourteenth Amendment Due Process right to be free from punishment altogether.[13] *Bell v. Wolfish* held that in determining whether a particular condition accompanying pretrial detention amounts to a denial of due process, the court must decide whether the condition is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. If a particular condition of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more,

amount to punishment. "[I]f a restriction or condition is not reasonably related to a legitimate goal—*if it is arbitrary* or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." [14]

As we noted in our earlier opinion:

Pretrial detainees are often entitled to greater protection than convicted persons. *See Bell v. Wolfish; Jones v. Diamond,* 5 Cir.1981, 636 F.2d 1364, 1368 ("The due process clause accords pre-trial detainees rights not enjoyed by convicted inmates.") Although "[t]he standard by which to measure the medical attention that must be afforded pretrial detainees has never been spelled out," *Jones v. Diamond,* 636 F.2d at 1378, both this Circuit and other circuits have held that pretrial detainees are entitled to at least the level of medical care set forth in *Estelle.*[15]

The Fourth Circuit has explicitly used an Eighth Amendment standard to assess a pretrial detainee's allegations of inadequate medical care.[16]

The Supreme Court, in a recent case holding that a city is not obligated to pay for medical services for inmates so long as such services are in fact provided, reiterated that the due process clause of the Fourteenth Amendment "does require the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police. In fact, *the due process rights of a [pre-trial detainee] are at least as great as the Eighth*

10. *See Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489, 500 (5th Cir. 1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

11. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *see also Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505, 506 (5th Cir.1971).

12. 429 U.S. at 106, 97 S.Ct. at 292.

13. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

14. 441 U.S. at 539, 99 S.Ct. at 1874.

15. 751 F.2d at 1452 n. 4.

16. *Whisenant v. Yuam,* 739 F.2d 160, 163 (4th Cir.1984).

*Amendment protection available to a convicted prisoner."* [17]

■ Under the *Bell v. Wolfish* standard, the defendants had a duty, at a minimum, not to be deliberately indifferent to Partridge's serious medical needs. A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills.[18] A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies. And just as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care absent an intervening legitimate government objective,[19] failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation under *Bell v. Wolfish.*[20]

*Daniels* rounds out our consideration of the circumstances under which the failure to provide medical care to a pretrial detainee is actionable. In *Daniels* an inmate of a city jail was injured when he slipped on a pillow left on a stairway by a sheriff's deputy. The Supreme Court held that an individual instance of negligence on the part of a jailor does not violate the due process clause of the Fourteenth Amendment, for that clause was intended to secure the individual from the arbitrary exercise of the power of government. But the clause does protect against arbitrariness and abuse of power, as distinguished from negligence or lack of due care.

■ To the extent that the complaint in *Partridge* alleges negligence on the part of the arresting officer,[21] it fails to state a claim, a conclusion which we had reached earlier and had applied to the claim against Morris. But to the extent that the claim rests on the detention center's deliberate and systematic lack of adequate care for detainees, it alleges the kind of arbitrariness and abuse of power that is preserved as a component of the due process clause in *Daniels.*

The responsibility of the City of Houston for the actions of its police administrators is a more difficult question. *Monell* held that municipalities are "persons" subject to damages liability under § 1 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, for violations of that act by municipal offi-

17. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (emphasis added).

18. *See Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir.1981); *see also Bee v. Greaves,* 744 F.2d 1387, 1395 (10th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3rd Cir.1979); *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977).

19. *Cf. Bass v. Sullivan,* 550 F.2d 229, 231–32 (5th Cir.) *cert. denied,* 434 U.S. 864, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977).

20. Defendants contend that the state cannot be liable in a § 1983 action under the Due Process clause when the plaintiff died by his own hand rather than by the hand of another. Earlier cases have held, however, that this distinction is not a per se bar to a § 1983 cause of action. The closest cases on point concern the Eighth Amendment's "deliberate indifference" standard. Although we have found no circuit case on point, district courts have interpreted *Scharfenberger v. Wingo,* 542 F.2d 328 (6th Cir.1976), to hold that liability under § 1983 "may be predicated upon inadequate custodial care of an inmate who might harm himself". *Matje v. Leis,* 571 F.Supp. 918, 930 (S.D.Ohio 1983). Protecting inmates from themselves is "an aspect of the broader constitutional duty to provide medical care for inmates". *Guglielmoni v. Alexander,* 583 F.Supp. 821, 827 (D.Conn.1984). We believe this statement is applicable to the state's duty to provide reasonable medical care for pretrial detainees and that liability under § 1983 will lie under some circumstances even if the detainee or prisoner died by his own hand rather than the hand of another.

21. In *Davidson v. Cannon* an inmate attacked and injured the plaintiff, another inmate. The plaintiff had written to an Assistant Superintendent of the prison concerning a threatened attack. The note had then been sent to a sergeant who had not notified others of the note and had forgotten about it when he went off duty. The plaintiff alleged only negligence. "Finding the principles enunciated in *Daniels* controlling," the Court held that "where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required." — U.S. ——, 106 S.Ct. at 670, 88 L.Ed.2d at 682.

cials.[22] But, as Justice Rehnquist pointed out in *City of Oklahoma City v. Tuttle*, decided on a full record:

> The Court [in *Monell*] noted, however, that municipal liability could not be premised on the mere fact that the municipality employed the offending official. Instead, we held that municipal liability could only be imposed for injuries inflicted pursuant to government 'policy or custom.' *Id.* at 694, 98 S.Ct. at 2037. We noted at the time that we had 'no occasion to address ... the full contours of municipal immunity under § 1983 ...,' *id.*, at 695, 98 S.Ct., at 2038, and expressly left such development 'to another day.' Today we take a small but necessary step toward defining those contours.[23]

In the *Oklahoma City* case Justice Rehnquist in his plurality opinion, joined by Chief Justice Burger, Justice White, and Justice O'Connor, held that an instruction to the jury was erroneous because it allowed an inference of liability where no wrong could be ascribed to municipal "decisionmakers."[24] Justice Brennan, joined by Justices Marshall and Blackmun, agreed that an instruction allowing the inference of the existence of a city policy from the misconduct of a single low-level officer would amount to permitting precisely the theory of *respondeat superior* liability rejected in *Monell*. Justice Brennan's opinion, however, holds that "there may be many ways of proving the existence of a municipal policy or custom that can cause a deprivation of a constitutional right, but the scope of § 1983 liability does not permit such liability to be imposed merely on evidence of the wrongful actions of a single city employee not authorized to make any city policy".[25]

By implication both opinions recognize municipal liability if the complaint clearly alleges a "policy", "custom", or "pattern" of "deliberate indifference" to the need for reasonable medical care of detainees. Implicitly and explicitly the City of Houston disputes the existence of such a policy. This is the central issue in the case, not the negligence per se of the officers involved.

The complaint, in part, satisfied the requirements of *Monell*. The plaintiffs alleged that the Houston Police Department had a custom of inadequate monitoring of suicidal detainees which amounted to a policy of denying them medical care. In addition, the complaint alleged that the city and the police department failed to "adequately train the jail personnel to handle arrested citizens with known mental problems". Arguably, inadequate training of police personnel may be the basis for finding a municipal custom of deliberate indifference to the constitutional rights of citizens.[26]

■ The district court dismissed the complaint against the City without mentioning the *Monell* issue. After the dismissal, this Court decided *Bennett v. City of Slidell*.[27] The *Bennett* decision spelled out the requirements of *Monell*. To establish a municipal custom, a plaintiff must prove a "persistent, widespread practice of city officials or employees, which ... is so common and well settled as to constitute a

**22.** 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**23.** —— U.S. ——, ——, 105 S.Ct. 2427, 2429, 85 L.Ed.2d 791, 796 (1985).

**24.** Justice Stevens dissented. He would apply the doctrine of *respondeat superior*. Justice Powell took no part in the decision of the case.

**25.** —— U.S. at ——, 105 S.Ct. at 2441, 85 L.Ed.2d at 810.

**26.** *See Voutour v. Vitale*, 761 F.2d 812, 820–23 (1st Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *Marchese v.*

*Lucas*, 758 F.2d 181, 188–89 (6th Cir.1985); *Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir.1981). Justice Rehnquist in *Oklahoma City* expressed some doubt whether inadequate police training could be considered a municipal "policy" that is the "'moving force' behind subsequent unconstitutional conduct". —— U.S. at —— n. 7, 105 S.Ct. at 2436 n. 7, 85 L.Ed.2d at 804 n. 7. This court has discussed the question in the light of the *Oklahoma City* case, but has not resolved it. *See Grandstaff v. City of Borger*, 767 F.2d 161, 169–70 (5th Cir.1985).

**27.** 735 F.2d 861, 862 (5th Cir.1984) (en banc) (per curiam), *cert. denied*, —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

custom that fairly represents municipal policy".[28] The governing body of the city must have actual or constructive knowledge of the custom.[29] The Partridges' complaint is *arguably* deficient in the light of *Bennett.* It alleged that the Police Department's custom of inadequate care for suicidal detainees was "familiar" to the city. Unless an expansive construction is given to the term "familiar", the complaint does not specifically allege that the custom was so persistent, widespread, common, and well settled as to represent municipal policy.

Since we find it necessary to remand the case to the district court to hear the Partridges' claims against the individual defendants—except Morris—and since the Partridges could not be expected to have foreseen the development of the custom requirement as stated in *Bennett,* and the policy requirement as spelled out in *Daniels* and *Davidson v. Cannon,* we grant the plaintiffs leave to file an amended complaint against the City of Houston. In doing so, we are guided by the policy of the federal rules favoring adjudication on the merits.[30] Furthermore, the facts alleged in the complaint are sufficient to support an allegation that the custom of inadequate care was persistent and widespread.

### III. Motion for Dismissal As A Motion for Summary Judgment

Although the district court styled its action as a dismissal under Fed.R.Civ.P. 12(b)(6), it stated in its order that it had "reviewed the record", "including attached exhibits". These exhibits were depositions in support of the plaintiffs' pleaded contentions. We therefore face the question whether we should treat the court's action as in fact a grant of summary judgment.[31] In *Carter v. Stanton,*[32] when the district court considered matters outside the plead-

ings, a motion to dismiss was treated as a motion for summary judgment. We have held that when the trial court considers matters outside the pleadings, the motion to dismiss *should* be treated as a motion for summary judgment, and the proceedings must comport with the hearing and notice requirements of Fed.R.Civ.P. 56(c).[33]

■ To the extent that the district court treated the motion to dismiss as a motion for summary judgment, we find that the ruling was in error. Such a motion is proper only if there are no matters open to factual dispute. In the present case, the central issue and many related material facts are disputed. And the record is inadequate. The plaintiffs offered to show, but had no opportunity to show, the policies of the detention center concerning detention procedures, although their depositions are supportive of the complaint. For example, did the jail take such obvious precautions against suicide as removing an inmate's belt? What procedures, if any, were adopted for a cell-watch to guard against a detainee committing suicide? What procedures, if any, were adopted to ascertain the clinical records of detainees?

The district court addressed the question of failure to "render" medical treatment. The Partridges, however, are not complaining only of the failure of particular low-level police officers to render medical treatment to Michael Partridge. They are complaining about the system—the failure of the City of Houston as a matter of policy or custom to staff, train, and supervise its detention center and to provide procedures for the care of detainees in need of protection. Whether the plaintiffs will ultimately succeed in proving that the alleged deficiencies of the City of Houston jail constituted a policy or custom is a proper matter for a trier of fact to decide. The dispute over material issues of fact and the incom-

---

**28.** 735 F.2d at 862.

**29.** *Id.*

**30.** *See Kauffman v. Moss,* 420 F.2d 1270, 1276 (3rd Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (1969).

**31.** *Carpenters Local,* 690 F.2d at 500.

**32.** 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972).

**33.** *Underwood v. Hunter,* 604 F.2d 367, 369 (5th Cir.1979).

plete nature of the record before us compel us to hold that, if we treat the motion as one for summary judgment, we must reverse the decision of the trial court and remand the case for trial.

### IV. Conclusion

The district court's dismissal of the complaint against Officer Morris is AFFIRMED. The dismissal of the complaint against the other defendants is REVERSED and the case is REMANDED for further proceedings. The plaintiffs shall be permitted to amend their complaint against the City of Houston in the light of *Bennett.* If they fail to do so, the suit against the City and the Police Department shall be dismissed.

E. GRADY JOLLY, Circuit Judge, dissenting:

I respectfully dissent for the following reasons:

1. Hard as I may try, the words of the complaint do not lead me to the same conclusions as they do the majority. I think the majority, disregarding Justice O'Connor's recent admonition in *Whitley v. Albers,* — U.S. —, —, 106 S.Ct. 1078, 1086, 89 L.Ed.2d 251 (1986), has "effectively collapsed the distinction between mere negligence and wanton conduct."

2. I believe the majority remands this case to the district court as an abstraction. Although the majority seems to say that the complaint alleges facts satisfying the "deliberate indifference to serious medical needs" standard, it also suggests, vaguely perhaps, that the plaintiff may be able to recover on a lesser standard at trial. The majority, however, like a humming bird darting about in a garden, never dwells long enough on any one suggestion to give the reader any idea what standard it has chosen or how such standard might be defined. Pity the poor district court that must instruct the jury using this opinion as guidance.

3. The majority construes *City of Oklahoma City v. Tuttle,* — U.S. —, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), beyond my recognition of that opinion when it suggests that *Tuttle* supports the complaint here. The plaintiffs here seek to impose liability by alleging that the charged officials and the City of Houston caused the death of their son through the "custom" or "policy" of failing to train police and jail personnel in suicide prevention or failing to establish other general procedures. Addressing the question whether a "policy" such as "failing to train" could support a section 1983 action, *Tuttle* expressed skepticism of, rather than support for, the view of the majority:

> [E]ven assuming that such a "policy" would suffice, it is open to question whether a policymaker's "gross negligence" in establishing police training practices could establish a "policy" that constitutes a "moving force" behind subsequent unconstitutional conduct, or whether a more conscious decision on the part of the policy maker would be required.

*Tuttle,* 105 S.Ct. at 2436 n. 7. Where, as here, the complaint alleges that the harm was caused by the deceased's *own hand,* it is not possible to argue convincingly, at least to me, that any such general "policy" or "custom" such as "failure to train" could provide the moving force in the suicide of a detainee who tragically hanged himself with his own socks. The Supreme Court has expressed my concern: "The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy by the 'moving force' behind a *constitutional violation." Tuttle,* 105 S.Ct. at 2436 n. 8 (emphasis in original). Furthermore, in *Tuttle,* Justice Rehnquist noted that

> the word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence can be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policy makers deliberately chose a training program which would prove inadequate.

*Tuttle,* 105 S.Ct. at 2436. In this case it is contrary to common sense to believe that

the City of Houston would deliberately have adopted a policy of inadequate supervision that would lead to strong likelihood of a detainee's suicide.

4. I conclude by pointing out that I continue to adhere to each of the positions expressed in my prior dissent. Cases of prison suicides should not be decided under *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); rather, these cases are more analogous to those involving a prisoner's attack on a fellow prisoner. 751 F.2d 1458–1459. The complaint here fails to make out a claim of "deliberate indifference," and states at most a marginal claim of negligence. *Id.* at 1457–58. The majority opinion conflicts with our own precedent and imposes an impractical burden on the prisons. *Id.* at 1455–56. These points are explicated in my previous dissenting opinion.

For all of these reasons as well as those given above for differing with the majority's revised opinion, I respectfully continue to dissent.