DAUGHTREY, Circuit Judge,
concurring in part and dissenting in part.
Because I agree that Officer Shadoan should have been granted qualified immunity in this case, I would reverse the district court’s decision on that issue. However, I cannot agree with the majority’s conclusion that Stephen Lamont Weaver’s constitutional rights were not violated, and I would therefore affirm the district court’s judgment with regard to Officer Owen.
The record reveals that neither officer saw nor otherwise had knowledge that Weaver had ingested cocaine. It is also undisputed that Weaver repeatedly denied swallowing any drugs. However, when Weaver became ill, the officers immediately summoned the paramedics, indicating that they did indeed suspect that he had swallowed the drugs. Officer Shadoan conceded that while waiting for the ambulance, he checked Weaver’s heartbeat and breathing — another indication that Sha-doan was concerned about Weaver’s condition.
The record further reveals that Officer Shadoan’s last dealings with Weaver were at the Oliver Springs Police Department after paramedics had been summoned to evaluate Weaver’s medical condition. When Shadoan last saw Weaver, Weaver was alive and did not show any signs of illness. Based on these undisputed facts, I would reverse the district court’s denial of qualified immunity for Officer Shadoan on the plaintiffs Fourteenth Amendment claim.
Officer Owen’s actions require a different analysis, however, because he alone transported Weaver to the Morgan County Jail in Wartburg, some distance from Oliver Springs. Taking the plaintiffs allegations as true, it appears that Weaver began to get sick and throw up within five minutes of leaving the police station in Oliver Springs. Despite having just been told by the paramedics, “If you see any other problems or anything at all changes, call us back,” Owen continued on the 20-25 minute drive to Wartburg. He could have, but did not, call ahead for medical assistance; he could have, but did not, return the short distance to the Oliver Springs police department; he could have, but did not, drive Weaver directly to an area hospital. As a result, by the time they arrived at the Morgan County Jail, Weaver was in such distress that he had to be carried from the car. Still, Owen did not request medical assistance for Weaver for another 15 minutes or more. Instead, he requested that one of the jailers, a certified EMT who was then his girlfriend and was later his wife, check on Weaver. She did so only by looking through the cell bars to see whether he was breathing. Owen did not call paramedics again for some 40 or 45 minutes after Weaver had first been seen by the paramedics in Oliver Springs.
Owen’s failure to seek prompt medical assistance or advice when Weaver’s condition deteriorated constitutes deliberate indifference because it was an unreasonable response to a known risk of serious harm. Owen asserts that he believed Weaver was “faking” his illness, but surely police officers are not free to substitute their own judgment for that of medical professionals when there is already reason to believe that there is cause for concern.[1]
*414 Furthermore, there can be no question that such “deliberate indifference to [Weaver’s] serious medical needs” was a violation of his constitutional right to be free from cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). While this right is often expressed as a matter of Eighth Amendment jurisprudence, the protection it affords is not limited to those who are incarcerated after conviction, but also applies pursuant to the Fourteenth Amendment to pre-trial detainees. See DeShaney v. Winnebago County Dep’t. of Soc. Servs., 489 U.S. 189, 198 n. 5, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir.1985). Moreover, in this case, the requirement that the right must have been clearly established in a particularized sense has also been satisfied. See Fitzke v. Shappell, 468 F.2d 1072, 1076 (6th Cir.1972) (“where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness [to one who is incarcerated], the denial of such aid constitutes the deprivation of constitutional due process”) (citations omitted).[2]
The fact that Weaver initially refused medical treatment does not alter this analysis. In Scharfenberger v. Wingo, 542 F.2d 328, 330 (6th Cir.1976), we held that “a prisoner’s custodians cannot lawfully deny ... adequate medical care even in instances of deliberate self injury.” The right, then, does not turn on whether the incarcerated individual affirmatively seeks medical treatment but, rather, on the officers’ awareness that medical treatment is necessary. Hence, in Rich v. City of Mayfield Heights, 955 F.2d 1092, 1096-97 (6th Cir.1992), we explicitly found that an incarcerated individual did not have a clearly established right “to be screened correctly for suicidal tendencies and ... to have steps taken which would have prevented suicide,” but we reiterated our prior holding that detainees do have a clearly established right “to adequate medical care ... where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness.” Id. at 1096 (quoting Fitzke, 468 F.2d at 1076).
The officers here, and Officer Owen in particular, were on notice that if Weaver developed additional symptoms, they should notify medical authorities immedi *415 ately. In failing to do so, Officer Owen forfeited his right to the qualified immunity to which he would otherwise be entitled. I therefore conclude that the district court was correct in denying qualified immunity to Officer Owen on Weaver’s Fourteenth Amendment claim and would affirm that portion of the district court’s judgment.

. It simply is not reasonable to believe that Weaver could be "faking” these symptoms in an attempt at escape despite the fact that he had tried to flee the police earlier at the arrest *414 scene. Police officers may in some situations reasonably deduce that a prisoner is feigning symptoms and wait to provide medical assistance until they have brought the prisoner to a secure location. That is not the case here. In response to Weaver’s physical distress, Owen did not simply make an initial decision not to seek immediate medical assistance, but instead deliberately ignored medical advice that he had already been given regarding Weaver. Additionally, if he truly believed Weaver was "faking,” he could have called ahead so that paramedics would be waiting for him, called an ambulance as soon as he arrived at the jail, or returned to the police department and sought medical assistance there. Any of these actions would have secured medical assistance for Weaver without creating an undue flight risk, yet Owen pursued none of them.

. Fitzke was arrested following an automobile accident and was incarcerated in the local jail. He was held from about 1:30 a.m. until 6:30 p.m. the same day — a period of about 17 hours — before he received requested medical treatment. During that time he suffered from a serious brain injury and complained of pain and numbness in various parts of his body. 468 F.2d at 1074-75. Fitzke alleged that the delay in receiving medical treatment increased the severity of his brain damage. Id. This court found that there was precedent for Fitzke’s claim that his treatment constituted a cause of action under 42 U.S.C. § 1983, holding that "under exceptional circumstances the failure to provide or permit access to medical care may give rise to a violation of one’s Fourteenth Amendment rights [since] such refusal could well result in the deprivation of life itself.” Id. at 1076 (internal quotation marks and citations omitted).